**EXHIBIT**
**H**

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Approved, SCAO

| | Original - Court | |
| | 1st copy - Judge/Assignment clerk (green) | 3rd copy - |
| | 2nd copy - Respondent (blue) | 4th copy - |

| STATE OF MICHIGAN | MOTION TO | Ⓐ CASE NO. |
| 31ST **JUDICIAL CIRCUIT** | MODIFY, EXTEND, OR TERMINATE | ∠19-0463 PH |
| ST. CLAIR **COUNTY** | PERSONAL PROTECTION ORDER | |

Court address
201 MCMORRAN BLVD. PORT HURON, MI 48060

Court telephone no.
(810) 985-2090

Ⓑ Petitioner's name
TINA TROY
Address and telephone no. where court can reach petitioner

Age

v

Respondent's name, address, and telephone no.
KEVIN LINKE

Age

**MOTION**

Ⓒ 1. On 3/4/2019 ___ a personal protection order was entered by this court.
Date

Ⓓ 2. ☑ a. I am the respondent. I ask the court to conduct a hearing to ☐ modify ☑ terminate the order.
☐ b. I am the petitioner. I ask the court to conduct a hearing to modify the order.
☐ c. I am the petitioner. I ask the court to ☐ extend ☐ terminate the order.
Explain why you want the order modified, extended, or terminated. If box a. is checked, the respondent must show good cause if the order was issued after a full hearing or if more than 14 days have passed since the order was issued ex parte (without a hearing).

See attached.

Ⓔ ☐ 3. I have a next friend motioning for me. I certify that the next friend is not disqualified by statute and is an adult.

Ⓕ 3/13/2019
Date

Signature of moving party

ST. CLAIR COUNTY
CLERK
PPO

2019 MAR 13 PM 12:15

RECEIVED
JAY M. DEBOYER

Complete this Notice of Hearing only
if you checked box 2.a. or 2.b. above.

**NOTICE OF HEARING**

Ⓖ You are notified that a hearing has been scheduled to modify, extend, or terminate the personal protection order issued in this case.

Judge: LANE

Date: 4/15/2019

Time: 10:30 A.M.

Location: Room 3200

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

The court can modify, extend, or terminate the order even if you do not attend the hearing. It is important for you to attend.

Ⓗ 3/13/2019
Date

Signature of moving party

MCL 600.2950, MCL 600.2950a, MCR 3.707

CC 379 (3/12) **MOTION TO MODIFY, EXTEND, OR TERMINATE PERSONAL PROTECTION ORDER**

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF ST. CLAIR**

**FAMILY DIVISION**

**TINA TROY**

*Petitioner,*

v

Case No. L 19-0463-PH

Hon. Cynthia Lane

**KEVIN JAMES LINDKE**

*Respondent.*

---

Tina Troy                                                    Kevin Lindke

▇▇▇▇▇▇                                                    ▇▇▇▇▇

▇▇▇▇▇▇▇                                                   ▇▇▇▇▇▇

---

### RESPONDENT'S MOTION TO TERMINATE PPO

**NOW COMES** Respondent, KEVIN JAMES LINDKE, in support of his motion states as follows:

1.     The Personal Protection Order was entered *"Ex Parte"* on March 4, 2019.

2.     Petitioner in this instant case is Tina Troy. Ms. Troy is the maternal great-aunt of Respondent's minor daughter, O▇▇▇▇▇▇ Respondent is embroiled in a very contentious and ongoing custody case with Petitioner's niece, Ami Moeller.

3.     Respondent firmly asserts to this Honorable Court that ***any and all communications attributed to Respondent in this instant case are all protected first amendment activities.***

4.    **FURTHERMORE,** Respondent relies upon the recent Michigan Court of Appeals published ruling in McGuire v. Zoran and its application in this instant case.    **EXHIBIT A**

5.    Petitioner's claims that Respondent is "attacking" and "targeting" Petitioner on social media is completely baseless and wholly without merit. Respondent leaves Petitioner to her strictest proofs.

6.    By Petitioner's own admission in her application for a PPO in this instant case, Petitioner disclosed numerous times that she herself initiated contact between the parties.

7.    Petitioner also failed to disclose in her petition for a PPO in this instant case that Petitioner herself was *posting untrue and defamatory statements in reference to Respondent prior to Respondent ever referencing Petitioner on Facebook.*    **EXHIBIT B**

8.    Any and all communications Respondent sent to Petitioner through private messages were immediately preceded by Petitioner herself publicly referencing Respondent on public Facebook groups. Petitioner's public comments referencing Respondent *were all untrue, defamatory, and libelous in nature.*

9.    Petitioner's claims that Respondent authored any posts on the "Justice For Oaklei" Facebook page are completely baseless and wholly without merit. Respondent leaves Petitioner to her strictest proofs.

10.    Respondent will produce numerous witnesses who will all testify under oath that they themselves are the authors of any and all public posts attributed to the "Justice For O█████" Facebook group.

11.    Amazingly, Petitioner herself *has continued to interact on the "Justice For Oaklei" page after being granted a PPO in this instant case.*    **EXHIBIT C**

12.    Respondent is also in possession of a private message sent from Petitioner to Respondent in which Petitioner herself mocks Respondent about *"rotting in jail".* This communication was sent *after* Petitioner was granted a PPO against Respondent.    **EXHIBIT D**

13.    Petitioner has also been sending defamatory and untrue information in private messages to members of the "Justice For O████" Facebook page. These communications directly reference Respondent. *These messages were sent after Petitioner was granted a PPO against Respondent.*    **EXHIBIT E**

14.    Respondent states to this Honorable Court that the hand written addition on line #13 by this Court in its Order that Respondent is prohibited from *"posting comments about Petitioner on social media"* is *a clear violation of Respondent's First Amendment rights.*

15.    Interestingly, this Court *DENIED* a PPO request submitted by Respondent just weeks prior to *GRANTING* the PPO request in this instant case.    **EXHIBIT F**

16.    It is quite obvious that Petitioner is attempting to manipulate this Honorable Court with false statements, inaccurate information, and the non-disclosure of Petitioner's own stalking behaviors and continued harassment of Respondent.

*WHEREFORE,* **Respondent** respectfully requests this Honorable Court dismiss with extreme prejudice the PPO in this instant case, as well as hold Petitioner in contempt of court under **MCLA 600.2950(24) and 600.2950(a)(21)**.

RESPECTFULLY,

DATED 3/13/19

**KEVIN LINDKE**

# STATE OF MICHIGAN

# COURT OF APPEALS

TM,

    Petitioner-Appellee,

v

MZ,

    Respondent-Appellant.

FOR PUBLICATION
October 23, 2018
9:10 a.m.

No. 329190
St. Clair Circuit Court
LC No. 15-001798-PH

## ON REMAND

Before: RIORDAN, P.J., and FORT HOOD and SERVITTO, JJ.

RIORDAN, P.J.

This case returns to us on remand from our Supreme Court. When we originally heard this case, we dismissed the appeal for mootness. *McGuire v Zoran*, unpublished per curiam opinion of the Court of Appeals, issued January 19, 2017 (Docket No. 329190). The Court reversed, reasoning that "the mere fact that the instant [personal protection order] PPO expired during the pendency of this appeal does not render this appeal moot," and remanded the case to us "for consideration on the merits." *TM v MZ*, 501 Mich 312, 320; 916 NW2d 473 (2018). Because the amended PPO was issued based on respondent's constitutionally protected speech and amounted to an unconstitutional prior restraint on his speech, we reverse the trial court.

### I. BACKGROUND FACTS & PROCEDURAL HISTORY

Petitioner TM and respondent MZ are neighbors in Cottrellville Township, Michigan. Respondent is a former trustee of Cottrellville Township and petitioner also has had some involvement in local politics, presently as a member of the Township Parks and Recreation Board. She also has participated in successful recalls of respondent and the supervisor of Cottrellville Township.

Petitioner and respondent have an acrimonious past which includes respondent's mother (with whom he lived) obtaining a PPO against petitioner's husband after he allegedly assaulted her. The impetuses for this appeal are highly inflammatory and negative comments respondent posted about petitioner and her family online. Respondent had posted negative comments about petitioner on Facebook, and through private messages, as far back as 2014, but when the nature

of these postings, in petitioner's words, "escalated[,]" she petitioned the trial court on July 20, 2015 for a PPO. In an attachment to the petition, petitioner identified eight dates on which respondent allegedly made derogatory comments about her and her family by way of posts on his own Facebook page, on public Facebook pages, or in private messages to undisclosed recipients. Specifically, the attachment stated:

> Below are some of the instances where [respondent] used the internet or a computer or other electronic medium to post both public and private messages for the purpose of terrorizing, frightening, intimidating, threatening, or harassing me.
>
> July 6, 2015
>
> [Respondent] made several comments on a post in the St. Clair County, Michigan page on Facebook, including but not limited to; calling me a criminal, accusing me of hiding criminals, having illegal trailers on my property, posting pictures of my yard, [stating] that I meet the requirements of "hurting someone" and that I'm a criminal.
>
> July 6, 2015
>
> [Respondent] sent a private Facebook message to multiple people, with regards to the above mentioned comments made on the St. Clair County, Michigan page, saying that I am criminal, I hide criminals, and saying things about the death of my son, which were not only derogatory and disgusting, but were complete lies, and how it was because of my parenting. These comments were in addition to other things.
>
> May 4, 2015
>
> [Respondent] posted on his Facebook page a picture of a car and a letter with a heading of "Attempted abduction in St. Clair Count [sic], Please share this Info!" Respondent then commented on the post that if there were any questions about the vehicle to join the St. Clair County, Michigan Facebook group.
>
> [Respondent] also commented on this post that the driver of the vehicle "was involved in a form of attempted abduction of a child" and further down [respondent] commented "I actually saw a similar vehicle at [TM's address], where it was there only a couple of minutes." This is my address.
>
> [Respondent] also made a comment on the post about the car on the St. Clair County, Michigan Facebook page wherein he stated "a vehicle just like that was at [petitioner's address] today . . . It watched my home, and then pulled into [petitioners's address]- an address notorious for everything from crime to severe ordinance violations that never go away. It was only there for a few minutes."
>
> April 22, 2015

[Respondent] made a comment on a post about a stolen bbq to "Go look at [petitioner's address]. . . It is a virtual junk yard of items picked up from the garbage of other[s]".

September 7, 2014

[Respondent] commented on a post in the St. Clair County, Michigan Facebook page about motorcycles stolen out of Auburn Hills, ". . . my neighbor is at [petitioner's address]. . . I saw them burning parts and burying them illegally in the ground before. I will be on the lookout for you."

August 10, 2014

[Respondent] wrote a post on the Facebook Cottrellville Township, Michigan page that included stating we had a "junkyard" and "two illegal commercial trailers".

[Respondent] then made a comment on his post stating ". . . Bob confirmed there is [sic] severe blight and health violations at [petitioner's address]. . ."

Respondent later puts a comment on his post with a Court Case [identification] number to look me up in the court docket.

Respondent later comments on his post that I was taken to court and at one time had 12 vehicles in my front yard.

June 2, 2014

[Respondent] commented on a post on the St. Clair County, Michigan Facebook page saying that my yard is used as an "illegal junkyard" and posts the link to a video.

July 24, 2014

[Respondent] sent a message to a private citizen making derogatory comments including that "that family is into drugs."

Further, in a Facebook message to an undisclosed recipient on July 6, 2015, respondent shared his comments and opinions on petitioner's parenting abilities, specifically accusing petitioner of allowing her children to partake of illegal drugs, and also discussed the alleged circumstances of her son's death.

On July 28, 2015, the trial court granted petitioner's petition and entered a PPO against respondent. The PPO prohibited respondent from "stalking as defined under MCL 750.411h and MCL 750.411i," and prohibited him from "posting a message through the use of any medium of communication, including the Internet or a computer or any electronic medium, pursuant to MCL 750.411s[.]" On August 3, 2015, respondent moved to terminate the PPO, arguing that petitioner merely was annoyed with his comments and that because there were no allegations of

actual, threatened, or attempted violence, her proper remedy was a lawsuit for defamation. At the August 20, 2015 hearing on respondent's motion, the trial court placed both parties under oath. Petitioner stated that, other than being his neighbor, she had no relationship with respondent, and she noted that in the online postings respondent said he was using binoculars to see what was going on in her yard, as well as taking pictures of her and her property, which made her fearful "as to why he's doing this[.]" Petitioner stated that she found respondent's conduct harassing and she just wanted him to leave her and her family alone. Noting that respondent's comments were personal attacks against her and her family, petitioner stated that respondent's actions put her "in fear of what [respondent] is going to do next[ ]" because of the escalation of the nature of the postings. Petitioner noted that respondent owned a firearm, and that she was in fear for her children and her grandchild.

Respondent's counsel argued that respondent's conduct consisted only of speech, "not actions, not threats, not anything." Respondent's counsel reiterated that petitioner's remedy was a defamation claim, not a PPO, and that the court-imposed prohibitions related to stalking were inappropriate. According to respondent's counsel, the PPO was a restraint on respondent's speech that impermissibly infringed on his First Amendment rights. While respondent's counsel characterized petitioner as actively involved in local politics, petitioner testified that she did not file the petition to recall respondent as a township trustee, but that she did participate in circulating the recall petition. After hearing oral argument, the trial court modified the PPO so that respondent only was prohibited from posting messages "pursuant to MCL 750.411(s)." The trial court subsequently entered (1) an order granting in part the motion to modify the PPO, (2) as well as the amended PPO. The amended PPO provides that respondent is prohibited from "posting a message through the use of any medium of communication, including the Internet or a computer or any electronic medium, pursuant to MCL 750.411s," and that the order remained in effect until January 28, 2016. Where there is no indication that the trial court renewed this amended PPO, it expired while the appeal to this Court was pending.

We do not disagree with the petitioner or the trial court that respondent's statements often were inappropriate, at times crude, and even sometimes, with respect to the death of petitioner's son, offensive. Inappropriate, crude, and offensive language, however, is not necessarily excepted from constitutional protection. Thus, we cannot adopt the trial court's preference to treat a PPO, which in this case is a prior restraint on respondent's speech, as a means "to help supplement the rules that we all live in society by." The First Amendment to the United States Constitution demands that we not treat such speech-based injunctions so lightly.

## II. CONSTITUTIONALLY PROTECTED SPEECH

Respondent argues that the trial court abused its discretion by issuing the PPO based solely on speech that was entitled to constitutional protection. We agree.

### A. STANDARD OF REVIEW

"We review for an abuse of discretion a trial court's determination whether to issue a PPO because it is an injunctive order." *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). " '[A]n abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes.' " *Sanders v McLaren-Macomb*, 323 Mich App

254, 264; 916 NW2d 305 (2018), quoting *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007) (alteration in *Sanders*). "A trial court . . . necessarily abuses its discretion when it makes an error of law." *Kostadinovski v Harrington*, 321 Mich App 736, 743; 909 NW2d 907 (2017) (quotation marks omitted). Constitutional issues, as questions of law, are reviewed de novo. *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 333; 901 NW2d 566 (2017). Similarly, questions of statutory interpretation also are reviewed de novo. *Millar v Constr Code Auth*, 501 Mich 233, 237; 912 NW2d 521 (2018).

## B. APPLICABLE LAW

In this case, petitioner sought a PPO pursuant to MCL 600.2950a, which allows for "an independent action to obtain . . . a [PPO] to restrain or enjoin an individual from engaging in conduct that is prohibited under . . . MCL 750.411h, 750.441i, and 750.411s." MCL 600.2950a(1). In order to warrant a PPO pursuant to MCL 600.2950a, the petition must "allege[] facts that constitute stalking as defined in section 411h or 411i, or conduct that is prohibited under section 411s, of the Michigan penal code . . . ." MCL 600.2950a(1). "[T]he petitioner [has] the burden of persuasion in a hearing held on a motion to terminate or modify an ex parte PPO." *Pickering v Pickering*, 253 Mich App 694, 699; 659 NW2d 649 (2002). Thus, petitioner had to present sufficient evidence of conduct prohibited by MCL 750.411s to "justify continuation of the PPO." *Pickering*, 253 Mich App at 699 (quotation marks omitted); MCL 600.2950a(1).

Conduct prohibited by MCL 750.411s includes posting "a message through the use of any medium of communication . . . without the victim's consent, if . . . [t]he person knows or has reason to know that posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim," and, by posting the message, the person "intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411s(1)(a)-(b). The statute also requires proof that conduct arising from posting the message would cause a reasonable person, and did cause the victim, to "suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411s(1)(c)-(d). However, MCL 750.411s "does not prohibit constitutionally protected speech or activity." MCL 750.411s(6). Therefore, in order to warrant a PPO pursuant to MCL 600.2950a(1), the trial court had to find that respondent's postings—his speech—were not constitutionally protected. MCL 750.411s(6).

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." *Virginia v Black*, 538 US 343, 358; 123 S Ct 1536; 155 L Ed 2d 535 (2003), quoting US Const, Am I. "The United States Supreme Court has held that the federal constitution protects speech over the Internet to the same extent as speech over other media." *Thomas M Cooley Law Sch*, 300 Mich App 245, 256; 833 NW2d 331 (2013), citing *Reno v American Civil Liberties Union*, 521 US 844, 870; 117 S Ct 2329; 138 L Ed 2d 874 (1997). However, the "right to speak freely is not absolute." *Cooley*, 300 Mich App at 256, citing *Chaplinsky v New Hampshire*, 315 US 568, 571; 62 S Ct 766; 86 L Ed 1031 (1942). For example, "[l]ibelous utterances [are] not . . . within the area of constitutionally protected speech" and so a state may enact laws punishing them. *Beauharnais v Illinois*, 343 US 250, 266; 72 S Ct 725; 96 L Ed 919 (1952).

Prohibitions relating to content, however, are few, due to the First Amendment's "bedrock principle" that an idea cannot be prohibited "simply because society finds the idea itself offensive or disagreeable." *Texas v Johnson*, 491 US 397, 414; 109 S Ct 2533; 105 L Ed 2d 342 (1989). "The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed." *R A V v City of Saint Paul, Minn*, 505 US 377, 386; 112 S Ct 2538; 120 L Ed 2d 305 (1992). "The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Virginia v Black*, 538 US 343, 358–359; 123 S Ct 1536; 155 L Ed 2d 535 (2003) (quotation marks omitted). Thus, the First Amendment does not protect obscenity or defamation, within certain limits. *R A V*, 505 US at 383. "A State may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace," including "fighting words," "inciting or producing imminent lawless action," and "true threat[s]." *Black*, 538 US at 359 (quotation marks omitted).

## C. ANALYSIS

The trial court abused its discretion by refusing to terminate the PPO. Respondent's Facebook posts and messages, quite clearly, were not "fighting words," did not "incit[e] or produc[e] imminent lawless action," and were not "true threat[s]." *Id.* Fighting words include " 'those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction . . . .' " *Id.*, quoting *Cohen v California*, 403 US 15, 20; 91 S Ct 1780; 29 L Ed 2d 284 (1971). There is nothing in the record to support, when respondent made any of the foregoing statements, he did so in a situation where it was "inherently likely to provoke violent reaction," considering he made the statements on the internet, in a public forum, far removed from any potential violence. See *id.* A "true threat," meanwhile, "encompass[es] those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 US at 359. While respondent's posts were undoubtedly in poor taste and offensive, they did not reach the level of intending the commission of an unlawful act of violence. See *id.*

Further, respondent's statements did not "incit[e] or produc[e] imminent lawless action . . . ." *Id.* The closest that respondent's speech came to that standard was his assertion that someone should "[g]o look at" petitioner's address in search of a stolen grill. That statement was not likely to incite illegal activities, because "looking at" an individual's house, yard, or property, is not illegal. Had respondent urged the individual to break in petitioner's house or to otherwise trespass on her property, there would be a legitimate question regarding whether his speech was protected. As the record stands, there was no such suggestion by respondent. *Id.*

The trial court noted that respondent's statements regarding petitioner's alleged illegal activities, the most serious of which was involvement in a kidnapping, likely would have produced unconsented contact from the community. Regardless of the veracity of that assertion by the trial court, the United States Supreme Court has determined in similar cases that respondent's speech still was protected. See *Org for a Better Austin v Keefe*, 402 US, 415, 417-419; 91 S Ct 1575; 29 L Ed 2d 1 (1971) (holding that First Amendment protection applied to the distribution of leaflets even where those leaflets accused an individual of racism, provided

-6-

personal information about the person including his telephone number, and urged the recipients of the leaflets to contact him); see also *NAACP v Claiborne Hardware Co*, 458 US 886, 909-910; 102 S Ct 3409; 73 L Ed 2d 1215 (1982) (holding that "[s]peech does not lose its protected character," even where the speech involved publicly listing the names of individuals that did not participate in a boycott, which undoubtedly was meant to lead to unconsented contact with those individuals, so as to "persuade [them] to join the boycott through social pressure and the 'threat' of social ostracism."). At its very base, the exception to the First Amendment for incitement of imminent lawless action requires that the incitement be for actually illegal actions, not just inconvenient or aggravating ones. See *id.* "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v State College Area Sch Dist*, 240 F3d 200, 204 (CA 3, 2001) (opinion by ALITO, J.). Here, the record does not support that respondent's statements were intended to incite imminent lawless action. *Keefe*, 402 US at 417-419.

Considering that these exceptions to constitutionally protected speech do not apply in the instant case, the only remaining prohibiting category that might be applicable is that the speech was defamatory. Defamatory speech is not protected by the United States Constitution. See *Beauharnais*, 343 US at 266. "A defamatory communication is one that tends to harm the reputation of a person so as to lower him in the estimation of the community or deter others from associating or dealing with him." *Lawrence v Burdi*, 314 Mich App 203, 214; 886 NW2d 748 (2016) (quotation marks omitted). A defamatory statement, by its very definition, is one that is false. *Edwards v Detroit News, Inc*, 322 Mich App 1, 12; 910 NW2d 394 (2017). "To be considered defamatory, statements must assert facts that are 'provable as false.' " *Ghanam v Does*, 303 Mich App 522, 545; 845 NW2d 128 (2014), quoting *Milkovich v Lorain Journal Co*, 497 US 1, 19; 110 S Ct 2695; 111 L Ed 2d 1 (1990). Generally, "[a]ccusations of criminal activity are considered 'defamation per se' under the law and so do not require proof of damage to the plaintiff's reputation." *Ghanam*, 303 Mich App at 545.

As an initial step, a trial court must determine whether respondent's statements were "provable as false" and thus capable of defamatory meaning, *Milkovich*, 497 US at 19, because "[w]hether a statement is actually capable of defamatory meaning is a preliminary question of law for the court to decide." *Sarkar v Doe*, 318 Mich App 156, 179; 897 NW2d 207 (2016) (quotation marks omitted).[1] However, while determining whether a statement is capable of defamatory meaning is a question of law for courts to decide, whether the statements actually were false and defamatory is not. See *id.*; see also *Masson v New Yorker Magazine, Inc*, 501 US 496, 521; 111 S Ct 2419; 115 L Ed 2d 447 (1991) (holding that falsity is a question of fact for a factfinder to determine where differing evidence is presented).

---

[1] Although ultimately irrelevant, considering that respondent also specifically accused petitioner and her family of committing a crime, which was provable as false, we question whether respondent's statements regarding petitioner's parenting was capable of defamatory meaning. See *Ireland v Edwards*, 230 Mich App 607, 619; 584 NW2d 632 (1998) ("The question whether someone is a 'fit mother,' like the question whether someone is abysmally ignorant, is necessarily subjective. Thus, defendant's statements regarding plaintiff's fitness as a mother are not actionable.").

Here, the trial court never made a determination whether the accusations made by respondent were false. When respondent stated that he could offer proof that his statements were true, the trial court refused to consider the evidence or to hold an evidentiary hearing. The trial court reasoned that an inquiry regarding falsity was unnecessary because, in the court's own words, "I don't believe because of [petitioner's] status that truth is an absolute defense to this, and so I'm going to deny your request for an evidentiary hearing because I don't think there's any need to do that." The trial court also stated, when discussing respondent's accusation that petitioner had assisted in a kidnapping, "whether or not that actually happened, I don't think that's the standard."

The trial court was incorrect. "Truth is an absolute defense to a defamation claim." *Wilson v Sparrow Health Sys*, 290 Mich App 149, 155; 799 NW2d 224 (2010). The rule applies even where the person who allegedly has been defamed is a private citizen and the alleged defamer is not a member of the media. *Hawkins v Mercy Health Servs, Inc*, 230 Mich App 315, 333; 583 NW2d 725 (1998). Thus, in order for respondent's statements to have been considered defamatory they must have been determined to be false, and the trial court, determining that such an inquiry was unnecessary, refused to accept evidence on the issue or to even make the determination. Consequently, we have not been provided with a record that would allow for us to make a determination whether respondent's statements were defamatory.[2] See *id.*

In sum, the trial court entered the PPO pursuant to MCL 600.2950a, finding a violation of MCL 750.411s. The trial court determined that respondent had violated MCL 750.411s by posting certain messages on Facebook. Pursuant to MCL 750.411s(6), however, the statute "does not prohibit constitutionally protected speech or activity." Speech over the internet is entitled to First Amendment protection in the same manner as traditional speech. *Cooley*, 300 Mich App at 256, citing *Reno*, 521 US at 870. Constitutionally protected speech includes all speech, but for that speech that falls into certain categories, including defamation, fighting words, inciting imminent lawless action, and true threats. *Black*, 538 US at 359; *Beauharnais*, 343 US at 266. Respondent's speech did not amount to fighting words, inciting lawless action, or true threats. *Black*, 538 US at 359; *Beauharnais*, 343 US at 266. It was not enough to show that respondent's words amounted to harassment or obnoxiousness. *Saxe*, 240 F3d at 204. Therefore, the only possible category remaining to the trial court that would not be considered

---

[2] Because the trial court failed to make the inquiry into falsity, the PPO must be vacated. Therefore, it would be unnecessary to consider whether, pursuant to Const 1963, art 1, § 19, the trial court is permitted to make such a determination. That constitutional provision provides that "[i]n all prosecutions for libels the truth may be given in evidence to the jury . . . ." *Id.* This Court and the Michigan Supreme Court previously have indicated that Const 1963, art 1, § 19, could apply in civil cases. See *Howe v Detroit Free Press, Inc*, 440 Mich 203, 225; 487 NW2d 374 (1992) (holding that the defendant's "constitutional right is implicated" in the civil case for libel); see also *Royal Palace Homes v Channel 7 of Detroit, Inc*, 197 Mich App 48, 56; 495 NW2d 392 (1992) (citing Const 1963, art 1, § 9, for the "basic principle of libel law that trust is a defense to an action for defamation."). Whether the constitutional provision at issue would apply in a PPO case is a determination for another day.

constitutionally protected speech was defamation. *Beauharnais*, 343 US at 266. The trial court's failure to assess whether respondent's statements were true or false, or to accept evidence on the issue, renders review of that issue impossible. Thus, respondent cannot be said to have defamed petitioner, nor is there anything in the record to support a finding that MCL 750.411s was violated. MCL 750.411s(6). Absent a violation of MCL 750.411s, there were no grounds on which to enter the PPO. MCL 600.2950a. Consequently, the trial court's decision to the contrary was an error of law, and therefore, an abuse of discretion. See *Kostadinovski*, 321 Mich App at 743.

Because we conclude "that the trial court should never have issued the PPO, respondent [is] entitled to have LEIN[3] reflect that fact." *TM*, 501 Mich at 319.

## III. PRIOR RESTRAINT ON SPEECH

Respondent also argues that the trial court abused its discretion by issuing the PPO that was an unconstitutional prior restraint on his speech. We agree.

### A. STANDARD OF REVIEW & APPLICABLE LAW

Constitutional issues, as questions of law, are reviewed de novo. *Winkler*, 500 Mich at 333. "We review for an abuse of discretion a trial court's determination whether to issue a PPO because it is an injunctive order." *Hayford*, 279 Mich App at 325. "The term 'prior restraint' is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v United States*, 509 US 544, 550; 113 S Ct 2766; 125 L Ed 2d 441 (1993) (quotation marks and citation omitted). Such restrictions are distinguishable from punishment arising from past speech that has been adjudicated as criminal. *Id.* at 550-551. Because injunctions "carry greater risks of censorship and discriminatory application than do general ordinances," they "require a somewhat more stringent application of general First Amendment principles." *Madsen v Women's Health Center, Inc*, 512 US 753, 764-765; 114 S Ct 2516; 129 L Ed 2d 593 (1994). Any prior restraint of expression bears "a heavy presumption against its constitutional validity." *Bantam Books, Inc v Sullivan*, 372 US 58, 70; 83 S Ct 631; 9 L Ed 2d 584 (1963).

### B. ANALYSIS

The PPO in this case was an unconstitutional prior restraint on respondent's freedom of speech. Whether and under what circumstances a court in Michigan is permitted to enjoin defamation has not been considered by this Court in a published decision since 1966, in *McFadden v Detroit Bar Ass'n*, 4 Mich App 554; 145 NW2d 285 (1966).[4] In that case, a panel of this Court held that "it is a familiar and well settled rule of American jurisprudence that equity

---

[3] LEIN stands for the law enforcement information network.

[4] This case is not binding because it was decided before November 1, 1990. MCR 7.215(J)(1).

will not enjoin a defamation, absent a showing of economic injury . . . ." *Id.* at 558. The *McFadden* Court provided that the primary reason for refusing to do so was "an abhorrence of previous restraints on freedom of speech," but acknowledged other reasons, including that there is "an adequate remedy at law, i.e., an action for damages, and that the defendant in a defamation action has the right to a jury trial which would be precluded by granting of an injunction." *Id.*

Contrary to *McFadden*, there is a modern trend toward allowing injunctions of defamatory speech. That modern trend, though, first requires a determination by a factfinder that the statements were definitively false, and then specifically limits any injunction to the adjudicated speech.[5] As discussed, *supra*, the trial court failed to make such a determination in this case. Therefore, regardless of whether the modern trend or the rule announced in *McFadden*, 4 Mich App at 558, is adopted, the issuance of the PPO here, because of the trial court's failure to determine that the speech actually was false, fails to overcome the "heavy presumption against its constitutional validity." *Bantam Books*, 372 US at 70.

In sum, because the trial court never determined what statements by respondent, if any, actually were false, there simply were no constitutionally permissible grounds, even considering the modern trend, on which to issue the PPO. See *Bantam Books*, 372 US at 70.

## IV. CONCLUSION

We reverse and remand with instruction that the "PPO should be updated in LEIN as rescinded." *TM*, 501 Mich at 320. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Karen M. Fort Hood
/s/ Deborah A. Servitto

---

[5] Numerous courts, both federal and state, have held that a trial court may enjoin a defendant from making defamatory speech, after there has been a determination that the speech was, in fact, false. See *Hill v Petrotech Resources Corp*, 325 SW3d 302 (Ky, 2010); *San Antonio Community Hosp v Southern California Dist Council of Carpenters*, 125 F3d 1230, 1239 (CA 9, 1997); *Lothschuetz v Carpenter*, 898 F2d 1200, 1208-1209 (CA 6, 1990) (WELLFORD, J., concurring and dissenting; HULL, J., concurring and dissenting); *Balboa Island Village Inn v Lemen*, 40 Cal 4th 1141, 1155-1156; 156 P2d 339 (2007); *Retail Credit Co v Russell*, 234 Ga 765, 777-779; 218 SE2d 54 (1975); *Advanced Training Sys, Inc v Caswell Equip Co, Inc*, 352 NW2d 1, 11 (Minn, 1984); *Sid Dillon Chevrolet-Oldsmobile-Pontiac, Inc v Sullivan*, 251 Neb 722, 732; 559 NW2d 740 (1997); *Organovo Holdings, Inc v Dimitrov*, 162 A3d 102 (Del Ch, 2017); cf. *Kinney v Barnes*, 443 SW3d 87 (Tex, 2014).





# Tina Troy

## You and Tina aren't connected on Facebook

6:44 PM

## Go rot in jail 😬

 ## You're welcome! 

Sent from web

If you reply, Tina will be able to call you and see
information like your Active Status and when you've
read messages.

I DON'T WANT TO HEAR FROM TINA

You can't reply to this conversation. Learn More

 **Message Requests** 

Open a request to get info about who's messaging you. They won't know you've seen it until you reply.



**Tina Troy**
**Go rot in jail** 😆 **You're welcome!** 🌝



**Dino Hines**
You can now call each other and see info...

Filtered Messages

Facebook User

→   See all

Suggested People

 # Chats  

Q Search

                

Your Story     Kyle     Stacey     Stephy     Sh

 **New Message Requests**
From Tina Troy



**Ami Renee**
Anthony Woodward the man who is recording is Kevin Lindke. He has a record a mile long- assault, domestic violence, resisting arrest, assault on a police officer, the list goes on. It is all public record (link below). This bailiff was right to have protection ready. The guy says he is shaking but the camera sure seems still to me? Looks like this bailiff is doing exactly what he was trained to do in this situation.
http://www.stclaircounty.org/DCS/search.aspx

STCLAIRCOUNTY.ORG

St. Clair County, Michigan

  **Tina**     

 

 ...guess noone can be as perfect as u.. 😄😄

> Perfect? That's funny. I'm not perfect. I just don't do drugs around my daughter, nor do I let her hang around child molesters. That's what your family does. 😂😄

> Oaklei is going to disown you. Just watch, Tina.

 Umm, no. O does not, nor has she since Ami found out.
Whatever...
Stop messaging me.



> Yes she has. And it's ALL documented. It's all coming out publicly. You are all so messed up. Its quite sad.



← **Replies**   🔍



**Ami Renee**
Kevin Lipa is his Facebok page. Kevin Lindke is his real name. Keith Wesley is another of his Facebook pages (his father's name). I think once a page/group blocks him, he uses another page to ask why or harass the admin of that page. I saw he did it to the Port Huron twp page. He deletes anything that can tell people the truth, so he will probably delete this before anyone can read it. Lol

57m   Like   Reply



**Lori Anthony** ✓
That's ok.. I have the screenshots

53m   Like   Reply                     1



**Scott Russel** ✓
**Lori Anthony** the guy has a compelling case based on the WW character



## Replies





**Tina Troy**

Why are u using a fake name by the way? Oh thats right, u were blocked!

1h     Like     Reply

 2



**Ami Renee**

**Tina Troy** he was blocked from the PoHo page, too?!

45m     Like     Reply

  **Tina**   

you. Just watch, Tina.


Umm, no. O does not, nor has she since Ami found out. Whatever...
Stop messaging me.

Yes she has. And it's ALL documented. It's all coming out publicly. You are all so messed up. Its quite sad.


Last warning, do not text or threaten me, again

You honestly believe that O will ever forgive you? And save your threats, Tina. They don't scare me. Lol

Stay off my page, butterball. 

And thanks for confirming again that O████ was in contact with Larry. 😂😄



← **Replies**    🔍



**Tina Troy**
Hes posting lies about his ex and their daughter that he hasnt had custody of in almost 2 years.

1h    Like    Reply



**Scott Russel** ✓
Why did he lose custody?

1h    Like    Reply



**Scott Russel** ✓
**Tina Troy**

1h    Like    Reply



**Tina Troy**
Long story!! Lol i dont have time to write a book.

1h    Like    Reply



**Scott Russel** ✓
**Tina Troy** give the main reasons then

1h    Like    Reply

 **Replies**

 **Tina Troy**
No, sadly, u are.
I am a proud aunt that is
involved in her life.

3h   Like   Reply    1

 **Ami Renee** ✋
She goes to school 5 days a
week. Don't believe everything
you read... **Tina**, they think
they know better than the
people who are actually in the
child's life. You won't win with
them and it isn't worth it the
energy..... ✌

3h   Like   Reply    1

 **Judy Smith**
Why not just keep the hired
help who has a very bad
past,away from the child? I
hope that there is an adult
supervising any child who is
around that man.

1h   Like   Reply    1

 ← **Replies** 



**Ami Renee**
You can look his real name up here, if you want to see what kind of dude it is.
http://www.stclaircounty.org/DCS/search.aspx

STCLAIRCOUNTY.ORG

St. Clair County, Michigan

2h   Like   Reply



**Lori Anthony** ✓
**Ami Renee** , thank you!   👍 1

2h   Like   Reply



**Scott Russel** ✓
Who's the Mother he's fighting with?

2h   Like   Reply   



**Tina Troy**
Shes my niece. 😄   👍 1

2h   Like   Reply

 ← Replies 

 **Jessica Hahn**
You are grossly
misinformed....

4h   Like   Reply

 **Tina Troy**
No, sadly, u are.
I am a proud aunt that is
involved in her life.

4h   Like   Reply           1

 **Ami Renee** 👋
She goes to school 5 days a
week. Don't believe everything
you read... **Tina**, they think
they know better than the
people who are actually in the
child's life. You won't win with
them and it isn't worth it the
energy..... ✌

3h   Like   Reply           1

 **Judy Smith**
Why not just keep the hired
help who has a very bad
past,away from the child? I

  **Tina**     

6:17 PM

U need to get your facts straight before u wrongly accuse me of interacting with Larry. He was talking about his sister in law, Tina Whitcomb, not me. I have never met or have spoken to Larry.



I suggest u remove my pic and the posts about me off of facebook.

I have my facts straight. How do you know who he is talking about if you've never met him or talked to him?

 **Replies** 



47m   Like   Reply



**Tina Troy**
Kevin, prior to the judgment, u had supervised visits. How long did that go on?

25m   Like   Reply



**Keith Wesley** 🖐
Again Tina, nothing you've posted has been accurate or true. Documents have proven your dishonesty. Kevin will be getting custody back real soon. Stay tuned. 🧎

20m   Like   Reply


← **Replies**

Replies to Scott's comment on your post


**Scott Russel** 
Why the accusation and the block?

8h   Like   Reply                    👍1


**Tina Troy**
Hes mad at me because I
called him out about the truth.

8h   Like   Reply


**Scott Russel** ✔
What's the truth?

8h   Like   Reply


**Tina Troy**
Hes posting lies about his ex
and their daughter that he
hasnt had custody of in
almost 2 years.

8h   Like   Reply


**Scott Russel** ✔
Why did he lose custody?

8h   Like   Reply



 **← Posts** 

 **Keith Wesley** shared a post to the group: **LIFE IN PO HO**. •••
Tue at 8:12 AM •

Tina, Tina, Tina. 😂😂😂

https://www.facebook.com/groups
/2845344492357419/permalink
/2954440398114494/



**Justice For O** ▮ ▶ **Justice for O** ▮
⚙ Admin • Tue at 8:03 AM • 🌐

O▮'s maternal aunt apparently doesn't understand how a PPO is supposed to work.

This all seems like just a game to her.

We are looking forward to addressing this nonsense in court.

It'll be interesting to see who actually goes to jail over this.

 **Chats**    1/3   



**Tina**
Active Now

Hi ⬜

I want to clear up a few things.
What "keith wesley" posts are not always the facts.
His real name is Kevin Lindke.
Look him up,he has a long criminal history!
His daughter/my great niece is not in any danger whatsover. She is not around a pedophile. Yes, 1 lives on her grandparents farm, but he is a 1/4 mile away. He does not ever have any 1 on 1 contact, not has ever. He works on the farm, but is never allowed in the house or in their social group. Kevin tends to change a few court docs around to look like theyre in his favor. Ummm, none of it goes together, if u look closely.

  **Tina**   
Active Now

in their social group. Kevin tends to change a few court docs around to look like theyre in his favor. Ummm, none of it goes together, if u look closely.
O goes to school daycare 5 days a week.
Kevin hasnt had custody in almost 2 yrs.
I promise u, that lil girl 8s sooo loved ad protected!



Also, hi!! I remember working with u many yrs ago. Lol i was roommates with 😁



FEB 28 AT 11:28 AM

Sorry for the typos, im at work, was trying to hurry. Lol

