UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN LINDKE,

     Plaintiff,                            Case No. 19-cv-11905

v.                                         Hon. Matthew F. Leitman

HON. CYNTHIA A. LANE, *et al.*,

     Defendants.

_____/

### OPINION AND ORDER GRANTING DEFENDANT CYNTHIA A. LANE'S MOTION TO DISMISS (ECF No. 29)

In this action, Plaintiff Kevin Lindke has sued the Honorable Cynthia A. Lane, a state court judge who presided over proceedings filed against him. He alleges that Judge Lane construed a Michigan statute so as to render it unconstitutional. He seeks a declaration that the statute, as interpreted by Judge Lane in his case, violates his First and Fourteenth Amendment rights.

If your instinct tells you that Lindke may not bring such a suit against Judge Lane, you are not alone. The United States Court of Appeals for the Sixth Circuit recently "question[ed] whether a dissatisfied litigant may *ever* sue an individual state judge in federal court over a decision the state judge rendered after proper adjudication and under their official duties." *Columbia MHC East v. Stewart*, 815 F. App'x 887, 891 (6th Cir. 2020) (emphasis in original).

Here, there is no question: under settled law, Lindke may not sue Judge Lane in order to challenge the statute she construed. Judge Lane has no interest with respect to the

statute that is adverse to Lindke's interests.  Lindke's claims against Judge Lane therefore do not present a justiciable case or controversy under Article III of the United States Constitution.  Accordingly, the Court lacks subject matter jurisdiction over those claims, and it dismisses them without prejudice.

## I

## A

This action arises out of state-court proceedings against Lindke under Michigan's non-domestic personal protection order statute, Mich. Comp. Laws § 600.2950a (the "PPO Statute").  In order to better understand Lindke's claims, it is helpful to understand how the PPO Statute works.

A proceeding under the PPO Statute begins when an "individual [] petitions the family division of [a] circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited" under certain provisions of Michigan law. Mich. Comp. Laws § 600.2950a(1).  The petition must "allege[] facts that constitute stalking" or cyberstalking "as defined" by Michigan law. *Id.*  And the petition may be filed with notice to the allegedly offending party or on an *ex parte* basis. *See* Mich. Comp. Laws § 600.2950a(12).  If the petition is filed *ex parte*, a court may not enter a personal protection order against the respondent "unless it clearly appears from specific facts shown by a verified complaint, written motion, or affidavit that immediate irreparable injury, loss, or damage [would] result from the delay required to effectuate notice or the notice will precipitate adverse action before a personal protection order can be entered." *Id.*

2

The PPO Statute requires that once "a court issues or refuses to issue a personal protection order, the court shall immediately state in writing the specific reasons for issuing or refusing to issue the personal protection order." Mich. Comp. Laws § 600.2950a(7). In the event a court decides to grant a personal protection order, it must "designate a law enforcement agency that is responsible for entering the personal protection order into" the Law Enforcement Information Network (the "L.E.I.N."), a database of all personal protection orders that is accessible by law enforcement. Mich. Comp. Laws § 600.2950a(10). In addition, the PPO Statute requires that any personal protection order include, among other things:

- "A statement that the personal protection order has been entered to enjoin or restrain conduct listed in the order";

- The potential consequences of violating the order;

- "A statement that the personal protection order is effective and immediately enforceable";

- "A statement listing each type of conduct enjoined";

- "An expiration date stated clearly on the face of the order"; and

- "The name of the law enforcement agency designated by the court to enter the personal protection order into the L.E.I.N."

Mich. Comp. Laws § 600.2950a(11).

Finally, the PPO Statute describes the procedure for challenging an *ex parte* personal protective order. It provides that "[t]he individual restrained or enjoined may file

a motion to modify or rescind the personal protection order and request a hearing under the Michigan court rules … within 14 days after the order is served or after the individual restrained or enjoined receives actual notice of the personal protection order." Mich. Compl. Laws § 600.2950a(12).  And it requires a court that receives such a motion to "schedule a hearing on a motion to modify or rescind an *ex parte* personal protection order within 14 days after the motion to modify or rescind is filed." Mich. Comp. Laws § 600.2950a(13).

**B**

On March 4, 2019, a woman named Tina Troy "filed an *ex parte* petition for the issuance of a personal protection order" against Lindke in the St. Clair County Circuit Court pursuant to the PPO Statute (the "PPO Petition").[1] (Sec. Am. Compl. at ¶23, PageID.998.)  In the PPO Petition, Troy claimed that Lindke engaged in conduct that she considered stalking and/or cyberstalking under Michigan law. (*See* PPO Pet., ECF No. 21-1, PageID.1026.)  For instance, Troy said that Lindke was "posting" harassing and false messages about her on Facebook. (*Id.; see also id.*, PageID.1029.)  Troy also said that Lindke had posted pictures of her on the internet without her consent and had falsely

---

[1] Lindke attached a copy of the PPO Petition to his Second Amended Complaint. (*See* PPO Petition, ECF No. 21-1.)  The Court may consider the PPO Petition when ruling on Judge Lane's motion to dismiss because exhibits attached to a plaintiff's complaint "are part of the record" and may be "consider[ed]" by a court "without converting [a] motion to dismiss into one for summary judgment." *Matthew N. Fulton, D.D.S. v. Enclarity, Inc.*, 962 F.3d 882, 890 (6th Cir. 2020) (explaining that "[u]nder this circuit's precedent, documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss") (internal quotation marks omitted).

accused her of "helping a violent sexual predator." (*Id.*, PageID.1029.)  Finally, Troy said that Lindke had "sent [her] multiple messages through private messenger on Facebook" even though she had "told him to stop more than once." (*Id.*)

C

The PPO Petition was assigned to Judge Lane. (*See* Sec. Am. Compl. at ¶31, ECF No. 21, PageID.1000.)  Judge Lane reviewed the PPO Petition, determined that relief should be granted, and issued an *ex parte* personal protection order against Lindke (the "PPO"[2]). (*Id.*)

In the PPO, Judge Lane made the findings required by the PPO Statute.  First, she found that Troy had filed a valid petition "requesting an order to restrain conduct prohibited" under Michigan law. (PPO, ECF No. 21-3, PageID.1033.)  Next, she found that it was appropriate to enter the PPO without advanced notice to Lindke because "irreparable injury, loss, or damage [would] result from the delay required to give notice or notice itself [would] precipitate adverse action before an order can be issued." (*Id.*)  Judge Lane then found that Lindke had "committed the following acts of willful, unconsented contact: Targeting [Troy] on social media on numerous occasions" and "[s]ending [Troy] messages thru Facebook Messenger." (*Id.*)

After making these findings, Judge Lane prohibited Lindke from "stalking" Troy. (*Id.*)  More specifically, Judge Lane "prohibited" Lindke from, among other things, "following or appearing within sight of [Troy]," "sending mail or other communications to

---

[2] Lindke attached a copy of the PPO to his Second Amended Complaint. (*See* PPO, ECF No. 21-3.)

5

[Troy]," and "threatening to kill or physically injure [Troy]." (*Id.*)  Judge Lane also barred Lindke from "posting comments about [Troy] on social media." (*Id.*)  The PPO became "effective" immediately, and by its own terms remained "in effect until [March] 4, 2020." (*Id.*)

The PPO provided that Lindke could "file a motion to modify or terminate" it within fourteen days "after being served with or receiving actual notice of" it. (*Id.*)

Finally, Judge Lane ordered the clerk of the court to "file [the PPO] with the St. Clair County Sheriff" so that the sheriff could enter the order into the L.E.I.N. (*Id.*)

### D

On March 13, 2019, Lindke filed a motion to terminate the PPO. (*See* St. Ct. Register of Actions, attached to Lindke's Sec. Am. Compl., ECF No. 21-2, PageID.1029.) Lindke argued that "any and all communications attributable to [him] … [were] all protected first amendment activities." (Lindke Mot. to Terminate PPO, attached to Lindke's Sec. Am. Compl., ECF No. 21-8, PageID.1124.)  He also maintained that Troy's allegations that he was "attacking" and "targeting" her on Facebook were "completely baseless and wholly without merit." (*Id.*, PageID.1125.)

Judge Lane held an evidentiary hearing on Lindke's motion on March 21, 2019. (*See* St. Ct. Register of Actions, ECF No. 21-2, PageID.1030.)  Both Troy and Lindke appeared for the hearing, and both parties were sworn. (*See id.*)  In addition, Troy provided testimony and presented evidence in support of her petition. (*See id.*)  Once the presentation of evidence was completed, Judge Lane continued the hearing for another date. (*See id.*) On September 19, 2019, Judge Lane held a final hearing and heard "closing arguments"

6

from the attorneys for both Troy and Lindke. (St. Ct. Register of Actions, ECF No. 29-3, PageID.1719.)  She then told the parties that she would issue a written decision on the motion. (*See id.*)

On October 28, 2019, Judge Lane issued a written decision granting in part and denying in part Lindke's motion to terminate the PPO. (*See* St. Ct. Decision and Order, ECF No. 29-2.[3])  In that decision, Judge Lane noted that under Michigan law, "[w]hen a Motion to Terminate a PPO is timely filed, the petitioner has the burden of justifying the continuation of the PPO." (*Id.*, PageID.1710.)  Judge Lane first concluded that Troy had not "demonstrated reasonable cause to believe that [Lindke] had engaged" in stalking under Michigan law. (*Id.*, PageID.1711.)  But Judge Lane also found that Troy did establish that Lindke had made "untrue postings" about her "for the purpose of harassing and causing others to harass [her]" in violation of Michigan's cyberstalking statute. (*Id.*, PageID.1711-1712.)  Judge Lane then amended and limited the PPO to track her findings.  As amended, the PPO "prohibit[ed Lindke] from posting defamatory statements about [Troy] on social media and/or from publishing such statements about her." (*Id.*, PageID.1711.)

---

[3] The Court may consider Judge Lane's October 28, 2019, decision and order without converting Judge Lane's motion to dismiss into a motion for summary judgment because it was "referred to" in Lindke's Second Amended Complaint and is "central" to his claims. *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (holding that consideration of insurance policies attached to defendant's motion to dismiss "did not require conversion" of the motion "into a motion for summary judgment" because the policies were "referred to throughout the complaint"). *See also* Sec. Am. Compl. at ¶¶ 40-43, ECF No. 21, PageID.1001-1002 (discussing Judge Lane's October 28, 2019, decision and order).

**E**

On June 26, 2019, Lindke filed this action under 42 U.S.C. § 1983. (*See* Compl., ECF No. 1.)  Now before the Court is his Second Amended Complaint. (*See* Sec. Am. Compl., ECF No. 21.)  In that pleading, he names Judge Lane and Timothy Donnellon, the St. Clair County Sheriff, as Defendants in their official capacities. (*See id.*)  Lindke insists that Judge Lane "authoritatively construed" the PPO Statute in a manner that violated his constitutional rights. (*Id.* at ¶¶ 35, 73, PageID.1000-1001, 1008.)  More specifically, he claims that the portion the PPO that prohibited him from posting communications about Troy on social media "unconstitutionally restrain[ed] his right to free speech under the First Amendment of the United States Constitution." (*Id.*)  Lindke also asserts that Judge Lane's entry of the PPO without notice violated his right to due process. (*See id.* at ¶105, PageID.1016.)

Lindke insists that he is "not attacking or challenging" the PPO "itself." (*Id.* at ¶77, PageID.1009.)  However, Lindke's first request for relief is that the court enter "[a] declaration that [the portion of the PPO prohibiting Lindke from posting about Troy on social media] is unconstitutional as creating illegal prior restraint of [Lindke's] First and Fourteenth Amendment freedoms of free speech and expression." (*Id.* at ¶134, PageID.1023.)

Lindke also seeks the following relief:

> [A] declaration that the [PPO Statute], as authoritatively construed [by Judge Lane], is unconstitutional as creating illegal prior restraint of [Lindke's] First and Fourteenth Amendment freedoms of free speech and expression and

Defendants violated [Lindke's] First and Fourteenth Amendment freedoms of free speech and expression;

[A] declaration the [PPO Statute], as authoritatively construed and/or as applied [by Judge Lane], violates [Lindke's] procedural due process rights under the Fourteenth Amendment;

To the extent not barred by federal law and/or to the extent that declaratory relief is unavailable, [] an injunction against one or both Defendants to enjoin any unconstitutional actions complained above and/or the [PPO Statute], as authoritatively construed and/or as applied; and

[A]ll applicable interest, costs, and attorney fees pursuant to 42 U.S.C. § 1988.

(*Id.*, PageID.1023-1024.)

## F

With Lindke's action pending in this Court, he appealed the entry of the PPO (as amended) to the Michigan Court of Appeals. (*See* Lindke St. Ct. Appeal Br., ECF No. 45-2.[4])  In that appeal, Lindke argued that the PPO Statute "does not bar or remedy defamation." (*Id.*, PageID.2342.)  He contended that Judge Lane thus "misused the [] statute" when she held that it prohibited Lindke from posting defamatory statements about Troy on social media. (*Id.*)  In the alternative, Lindke asserted that Judge Lane's amended order was an unconstitutional prior restraint on his right to free speech. (*See id.*, PageID.2343.)

---

[4] "Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6), a court may take judicial notice of other court proceedings without converting the motion into one for summary judgment." *Buck v. Thomas M. Cooley Law School*, 597 F.3d 812, 816 (6th Cir. 2010).

9

The Michigan Court of Appeals agreed with Lindke that the PPO, as amended, was "much too broad and unconfined to the boundaries" set forth in Michigan law. *TT v. KL*, --- N.W.2d ---, 2020 WL 6370356, at *15 (Mich. Ct. App. Oct. 29, 2020). It then said that Judge Lane's order "neede[d] to be specifically limited to the adjudicated speech" – *i.e.*, the specific speech that Judge Lane found to be false and defamatory after the evidentiary hearing. *Id.*   The Court of Appeals remanded the action back to Judge Lane with instructions to "further modif[y]" the PPO "consistent with [its] opinion" if that order "remain[ed] in effect" and had not expired. *Id.* and *id.* n.18.

Lindke believes that the Michigan Court of Appeals' decision does not go far enough.  He says that the Court of Appeals should have held that the PPO Statute never authorizes a trial judge to "enjoin a defamation." (Lindke Mich. Sup. Ct. App., ECF No. 64-1, PageID.2635.)  Lindke has therefore filed an application for leave to appeal in the Michigan Supreme Court. (*See id.*)  As of the date of this Opinion and Order, Lindke's application remains pending with that court.

## II

On February 21, 2020, Judge Lane filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* Mot. to Dismiss, ECF No. 21.)  She argues, among other things, that the Court lacks subject matter jurisdiction over the claims brought against her because (1) "the case or controversy requirement of Article III of the Constitution requires that [Lindke] show that he and [Judge Lane] have adverse legal interests" and (2) she does have not an interest with respect to this action that is adverse to Lindke's interests.  (Judge Lane Supp. Br., ECF No. 52, PageID.2480, 2484.)

10

The Court held a video hearing on Judge Lane's motion on July 28, 2020.

### III

As described below, there is widespread agreement among federal courts that a plaintiff may not bring a Section 1983 claim against a state court judge attacking the constitutionality of a statute that the judge construed and applied while adjudicating a dispute. The courts have uniformly rejected these claims on the ground that the interests of a judge who has construed a statute in her capacity as a neutral adjudicator are not adverse to the interests of a plaintiff who challenges the constitutionality of the statute. But while all courts agree that this lack of adversity dooms the claims against the judges, the courts have offered differing explanations as to why that is so. Some courts have concluded that the lack of adversity makes the judge an improper party to a claim challenging the constitutionality of a state statute, and those courts have dismissed those claims on the merits under Federal Rule of Civil Procedure Rule 12(b)(6). Other courts have concluded that the lack of adversity means that the claims against judges present no case or controversy under Article III, and those courts have dismissed the claims for lack of subject matter jurisdiction.

The Sixth Circuit has not yet formally "staked out [its] position" on these issues. *McNeil v. Community Probation Services, LLC*, 946 F.3d 991, 996-97. However, it has observed that "our sister circuits have pointed out that there is usually no case or controversy between judges acting as adjudicators and litigants displeased with litigation outcomes." *Id*. And it has "cited that position favorably in unpublished opinions." *Id*. In one such decision, it held that the lack of adversity between a Section 1983 plaintiff and a

defendant-judge who acted in an adjudicatory capacity presented an Article III problem that deprived the court of subject matter jurisdiction. *See Cooper v. Rapp*, 702 F. App'x 328, 333-34 (6th Cir. 2017).

For the reasons explained below, this Court joins the myriad other federal courts that have concluded that a plaintiff may not bring a Section 1983 action challenging a state statute against a state court judge who construed the statute while acting in adjudicatory capacity. The Court further concludes – like the Sixth Circuit in *Cooper*, *supra* – that the lack of adversity between the judge and the plaintiff in such an action deprives the Court of Article III subject matter jurisdiction.

### A

The First Circuit's decision in *In re Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17 (1st Cir. 1982), is the "seminal" decision in the line of cases holding that (1) a judge is an improper party in a Section 1983 action challenging the constitutionality of a statute interpreted and applied by the judge in her adjudicatory capacity and (2) that such a claim should be dismissed under Rule 12(b)(6). *Allen v. DeBello*, 861 F.3d 433, 440 (3d Cir. 2017) (describing *In re Justices*). *In re Justices* involved a Puerto Rico statute that required attorneys to "belong to and support" the Puerto Rico Bar Association Foundation (the "Foundation"). *In re Justices*, 861 F.3d at 18. A group of attorneys refused to pay their required fees to the Foundation, and the Foundation "filed disciplinary complaints" against the attorneys in the Puerto Rico Supreme Court. *Id.* at 19. The attorneys responded "by attacking the mandatory membership and dues provisions as unconstitutional" under Puerto Rico's constitution. *Id.* The Puerto Rico Supreme Court held that "the membership

and dues provisions were valid" and constitutional. *Id.* That court then ordered the attorneys to "pay their dues," and when the attorneys refused, the court "suspended them from the practice of law." *Id.*

The attorneys then sued in federal court. In that suit, "they attacked the membership and dues statutes again, this time expressly on federal constitutional grounds." *Id.* The attorneys sued the Justices of the Puerto Rico Supreme Court (along with certain other defendants), and they "sought an injunction barring any of the defendants from enforcing the statutes" against them. *Id.* The Justices responded that the federal claims against them presented no case or controversy because "they and the plaintiffs posses[sed] no [] 'adverse legal interests,' for the Justices' only function concerning the statutes being challenged [was] to act as neutral adjudicators rather than administrators, enforcers, or advocates." *Id.* at 21.

The United States Court of Appeals for the First Circuit agreed with the Justices. In an Opinion by Judge (now Justice) Stephen Breyer, the First Circuit explained that "at least ordinarily, no 'case or controversy' exists between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Id.* The First Circuit then concluded that the Justices did not have an interest adverse to those of the lawyers challenging the statutes because the Justices "act[ed] as they would in any other case based upon a [Puerto Rico] statute: they [sat] as adjudicators, [found] facts and determin[ed] law in a neutral and impartial judicial fashion." *Id.* And because the "role of the Justices with respect to [the challenged] statutes [was] adjudicative," there was no adverse legal interest

13

between the Justices and the plaintiffs. *Id.*  Given that lack of adversity, the Justices were

not proper parties to the action:

> Judges sit as arbiters without a personal or institutional stake
> on either side of the constitutional controversy. They are sworn
> to uphold the Constitution of the United States. They will
> consider and decide a claim that a state or Commonwealth
> statute violates the federal Constitution without any interest
> beyond the merits of the case. Almost invariably, they have
> played no role in the statute's enactment, they have not
> initiated its enforcement, and they do not even have an
> institutional interest in following their prior decisions (if any)
> concerning its constitutionality if an authoritative contrary
> legal determination has subsequently been made (for example,
> by the United States Supreme Court). In part for these reasons,
> one seeking to enjoin the enforcement of a statute on
> constitutional grounds ordinarily sues the enforcement official
> authorized to bring suit under the statute; that individual's
> institutional obligations require him to defend the statute. One
> typically does not sue the court or judges who are supposed to
> adjudicate the merits of the suit that the enforcement official
> may bring.

*Id.* at 21.

Even though the First Circuit concluded that the Justices' interests were not adverse

to those of the plaintiffs, the court expressly declined to reach to reach the question of

whether the action presented a case or controversy under Article III. *See id.* The court said

that it was "reluctant to rest [its] decision directly on Article III when the case can be

resolved on a nonconstitutional basis." *Id.*  The court ultimately determined that "dismissal

for failure to state a claim" was "proper" because the judges "were not proper party

defendants." *Id.*

The United States Court of Appeals for the Third Circuit adopted and applied the *In

Re Justices* framework in *Allen*, *supra*.  The plaintiffs in *Allen* filed a federal civil action

14

against several New Jersey state court judges "challeng[ing] [a] New Jersey state statute" that applied in child custody disputes "and the New Jersey courts' policy on plenary hearings in [those] disputes." *Allen*, 861 F.3d at 437.  The plaintiffs sought, among other things, "declaratory and injunctive relief." *Id.*  The judges moved to dismiss on the ground that they "were not proper parties to a suit brought under Section 1983." *Id.* at 439.  The district court agreed, and the Third Circuit affirmed the dismissal of the plaintiffs' claims. *See id.*

The Third Circuit explained that "[u]nder the *In re Justices* test, a judge who acts as a neutral and independent decision arbiter of a statute is not a proper defendant to a Section 1983 suit challenging the constitutionality of the statute." *Id.*  at 440.  The court held that the state judges were acting in their adjudicative capacity when applying the New Jersey custody statute at issue – and were therefore "not proper parties" – because the judges did not initiate the underlying proceedings and did not have any administrative functions with respect to the statute:

> In this case, because we conclude that the judicial defendants have acted in an adjudicatory capacity and not in an enforcement capacity, they are not proper defendants. To be sure, the best-interests-of-the-child standard statute gives state court judges broad discretion to determine a custody situation. State court judges also have broad discretion to decide motions on the papers under New Jersey Supreme Court and Appellate Division precedent. However, […] the state court judges themselves do not have any right to initiate these actions. Instead, a parent must initiate a custody dispute. Nor were the state court judges here given any administrative function. Moreover, the state court judges did not promulgate either the statutes or the judicial standards to which the Plaintiffs object. Furthermore, where the judge determines that there is a genuine issue as to a material fact relating to the custody

15

> dispute, a plenary hearing must be held, providing Plaintiffs with additional procedural safeguards. [….] Accordingly, the Defendants here are not proper parties to this action under Section 1983 for declaratory or injunctive relief.

*Id.* at 442. Like the court in *In re Justices*, the court in *Allen* "declin[ed] to rest dismissal … on Article III grounds." *Allen*, 861 F.3d 443 at 442 n. 49.

The Eighth and Ninth Circuits have likewise held that a plaintiff may not bring a Section 1983 action challenging a state statute against a state court judge who construed the statute while acting in adjudicatory capacity. *See R.W.T. v Dalton*, 712 F.2d 1225 (8th Cir. 1983), *abrogated on other grounds by Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827 (1990); *Grant v. Johnson*, 15 F.3d 146 (9th Cir. 1994). Like the First and Third Circuits, these courts have held that such claims are properly dismissed under Rule 12(b)(6) on the ground that the judges are not "proper defendant[s]." *Grant*, 15 F.3d at 148; *R.W.T.*, 712 F.2d at 1232-33.

## B

Other courts have treated the lack of adversity between a judge who has acted in an adjudicatory capacity and a litigant challenging a state statute as an Article III subject matter jurisdiction issue. The Fifth Circuit did so in *Bauer v. Texas*, 341 F.3d 352 (5th Cir. 2003). The plaintiff in *Bauer* sued the Presiding Judge of the Harris County Probate Court "seeking a declaratory judgment under 42 U.S.C. § 1983 that Section 875 of the Texas Probate Code [was] unconstitutional." *Id.* at 354 (internal quotation marks omitted). The plaintiff alleged that pursuant to Section 875, the judge had "appointed her son [as] the temporary guardian of her person and estate." *Id.* The plaintiff insisted that she did not

need a guardian, and she claimed that Section 875 "violat[ed] her due process and equal protection rights because the standard of proof for appointment of a temporary guardian [did] not meet constitutional requirements." *Id.* at 355.

The judge moved to dismiss. He asserted that "[S]ection 1983 relief against him was unavailable because he applied the challenged statute in his adjudicative capacity." *Id.* at 355. The district court agreed and dismissed, and the Fifth Circuit affirmed.

The Fifth Circuit first explained that "[t]he requirement of a justiciable controversy [under Article III] is not satisfied where a judge acts in his adjudicatory capacity." *Id.* The court then held that the defendant-judge was acting in his adjudicatory capacity because he "did not, and could not have, initiated temporary guardianship proceedings under [the challenged statute]." *Id.* at 361. "Instead, the requirements that the judge be presented with evidence, that an application be filed, notice be given, and a hearing be held, all of which were followed [in the underlying case], demonstrate that [the] judge act[ed] in his adjudicatory capacity" when applying Section 875. *Id.* The court concluded that because there was "a lack of adversity between [the plaintiff] and [the state court judge] as to the facial constitutionality of [Section 875]," the claims against the judge presented "no case or controversy" under "Article III" of the Constitution. *Id.* at 359. *See also Machetta v. Moren*, 726 F. App'x 219, 220 (5th Cir. 2018) (citing *Bauer* for proposition that Section 1983 claims against judge challenging statute that judge construed in adjudicatory capacity presents no Article III case or controversy and affirming dismissal for lack of subject matter jurisdiction).

The Second Circuit reached the same conclusion in *Mendez v. Heller*, 530 F.2d 457 (2d Cir. 1976). In *Mendez*, a plaintiff who sought a divorce from her husband challenged the constitutionality of a New York statute that required her to live continuously in New York for two years before filing a divorce action in that State. *See id.* at 458. "Proceeding on the assumption that a complaint for divorce would be rejected on jurisdictional grounds by the State courts, [the plaintiff] turned to the federal courts, apparently expecting them to be more favorably disposed toward her contention that [the New York statute was] unconstitutional." *Id.* The plaintiff sued, among others, Justice Louis B. Heller, the state judge who would have presided over her divorce proceedings. *See id.*

The case was first presented to a three-judge panel on the United States District Court for the Eastern District of New York. *See Mendez v. Heller*, 380 F.Supp. 985 (E.D.N.Y. 1974). "The first question" that that court confronted was "whether [the plaintiff's] action present[ed] a genuine case or controversy in which the issue put forward by the plaintiff [could] be resolved." *Id.* at 987. The federal district court concluded that it did not. The court explained that "entertainment of [the] plaintiff's suit [would] require[] the conclusion that there is a genuine controversy between the plaintiff and one or more of the defendants in which they have an interest adverse to hers in determination of the question." *Id.* at 990. The court then said that Justice Heller "has no such [adverse] interest; if, as plaintiff contends the statute is unconstitutional, Mr. Justice Heller's sole interest is in so determining, and in denying effect of the statute. He is not adversary of the plaintiff, but a judicial officer bound to decide the issue according to the law as he finds it." *Id.* And

because "the essential quality of adverseness [was] intrinsically absent," the plaintiff's claim was "one that [could not] be entertained in" a federal court. *Id*.[5]

The Second Circuit affirmed. It agreed with the district court that because Justice Heller would be acting in his "judicial capacity" in plaintiff's to-be-filed divorce case, he was not adverse to plaintiff in her federal action. The court thus concluded "that this case does not present the 'honest and actual antagonistic assertion of rights,' *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, (1892), 'indispensible to adjudication of constitutional questions . . ..' *United States v. Johnson*, 319 U.S. 302, 305 (1943) (per curiam)." *Mendez*, 530 F.2d at 460. Stated another way, the action did "not present the 'exigent adversity', *Poe v. Ullman*, 367 U.S. 497, 506, (1961), which is an essential condition precedent to federal court adjudication." *Id.* at 461.[6]

Finally, as noted above, in the unpublished *Cooper* decision, the Sixth Circuit held the lack of adversity between a plaintiff and a defendant-judge deprived the federal courts

---

[5] Even though the district court held that it lacked subject matter jurisdiction over the action, it opined on the merits of the plaintiff's challenge to the New York statute. *See Mendez*, 380 F.Supp. at 993-96. The Supreme Court later entered a one-sentence order vacating the district court's judgment and remanding the action to the Second Circuit. *See Mendez v. Heller*, 420 U.S. 916 (1975). The sole purpose of the remand was to have the Second Circuit review "the justiciability issue." *Mendez*, 520 F.2d at 458-59 and n. 2.

[6] There is some dispute as to the basis of the Second Circuit's holding in *Mendez*. Some courts read the decision as resting upon a non-constitutional ground – as holding that the plaintiff failed to state a claim on which relief can be granted. *See In Re Justices*, 695 F.2d at 22; *Brandon E. ex rel Listenbee v. Reynolds*, 201 F.3d. 194, 198 n. 3 (3d Cir. 2000). Other courts view the decision as resting upon Article III. *See Bauer*, 341 F.3d at 359. Given the language used by the Second Circuit (discussed above), this Court reads *Mendez* as resting upon constitutional grounds. Notably, the concurrence in *Mendez* recognized the "evidently constitutional" basis of the court's holding. See *Mendez*, 530 F.2d at 461 n. 1 (Oakes, J., concurring in the judgment).

19

of Article III jurisdiction over the plaintiff's claims against the judge. *See Cooper*, 702 F. App'x at 333-34.    The plaintiffs in *Cooper* had sued a bank in state court for recording cognovit judgments that the bank had obtained under Ohio law. *See id.* at 329.  The plaintiff claimed, among other things, that the bank misused Ohio's cognivit judgment statute and that the statute was unconstitutional. *See id.*   State Judge James Rapp presided over the proceedings. *See id*.  He granted summary judgment in favor of the bank and awarded sanctions against the plaintiffs. *See id.* at 330.  The plaintiffs then brought a Section 1983 claim against Judge Rapp in federal court. *See id.*  They alleged that Judge Rapp's conduct during the litigation violated their rights under the First, Fourth, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution. *See id.*  They sought declaratory and injunctive relief and also requested an award of damages. *See id.* at 330-31.    The district court dismissed plaintiffs' claims for lack of subject matter jurisdiction, and the Sixth Circuit affirmed.

The Sixth Circuit held that the plaintiffs' "request for a declaratory judgment [was] barred by Article III's case-or-controversy requirement." *Id.* at 333. It explained that the case presented no case or controversy because Judge Rapp "was not an adversary of [the plaintiffs] in the state-court proceedings, which challenged the implementation of Ohio's cognovit-judgment statute by Commercial Savings Bank. Nor was he acting as the enforcer or administrator of that statute. Instead, Judge Rapp acted as a disinterested judicial adjudicator, bound to decide the issues before him according to the law." *Id.* at 333-34. "Under these circumstances," the district court lacked jurisdiction to hear and decide the plaintiffs' claims for declaratory relief against Judge Rapp. *Id.*

20

## C

Like the Second, Fifth, and Sixth Circuits, this Court concludes that the lack of adversity between a plaintiff challenging a state statute and a state judge who has acted in an adjudicatory capacity deprives a federal court of subject matter jurisdiction under Article III. Indeed, for nearly one hundred years, it has not been "open to question" that "the judicial power vested by Article 3 of the Constitution … is limited to cases and controversies … *with adverse litigants*." *Liberty Warehouse Co. v. Grannis*, 273 U.S. 70, 74 (1927) (emphasis added).[7] Thus, the lack of adversity between a plaintiff challenging a state statute, on one hand, and a judge who construed the statute in an

---

[7] *See also Richardson v. Ramirez*, 418 U.S. 24, 36 (1974) (explaining that the judicial power is "limited by the case-or-controversy requirement of Art. III to adjudication of actual disputes *between adverse parties*") (emphasis added); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297-98 (explaining that "[t]he basic inquiry" for determining whether a "case" or "controversy" exists "within the meaning of Art. III …. is whether the conflicting contentions of the parties . . . present a real, substantial controversy between parties *having adverse legal interests*, a dispute definite and concrete, not hypothetical or abstract") (emphasis added; internal quotation marks omitted); *Ahmed v. Univ. of Toledo*, 822 F.2d 26, 27 (6th Cir. 1987) ("Where there is no real, substantial controversy between parties *having adverse legal interests*, there is no case or controversy in the constitutional sense") (emphasis added; internal quotation marks omitted); *Affholder, Inc. v. Preston Carroll Co. Inc.*, 866 F.2d 881, 885 (6th Cir. 1989) ("Under Article III, the federal judiciary cannot exercise jurisdiction over any alleged dispute in which a judgment will not touch the legal relations of parties having adverse legal interests") (internal quotation marks omitted); *Commodities Export Co. v. Detroit Intern. Bridge Co.*, 695 F.3d 518, 525 (6th Cir. 2012) (explaining that when determining if there is a "live case or controversy" under "Article III" in a case seeking a declaratory judgment, courts "ask whether the facts alleged, under all the circumstances, show that there is a substantial controversy, *between parties having adverse legal interests*, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment") (emphasis added; internal quotation marks omitted).

adjudicatory capacity, on the other hand, deprives a federal court of Article III subject matter jurisdiction to hear the challenge.

The Court respectfully disagrees with the approach taken by the courts that have treated the lack of adversity as going to the merits of the plaintiff's Section 1983 claim rather than negating subject matter jurisdiction. Those courts were "reluctant to rest [their] decision directly on Article III when the case can be resolved on a nonconstitutional basis." *In Re Justices*, 695 F.2d at 22. But while courts generally avoid deciding constitutional questions were possible, *see, e.g.*, *Olympic Arms, et al. v. Buckles*, 301 F.3d 384, 388 (6th Cir. 2002) (declining to rule on constitutional grounds under "the basic canon of avoiding constitutional questions where possible"), that is *not* the case with respect to constitutional questions *under Article III*. A federal court must always address those questions – even when they are not raised by the parties. *See, e.g.*, *Williams v. United States*, 927 F.3d 427, 434 (6th Cir. 2019) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore [courts] must raise and decide jurisdictional questions that the parties either overlook or elect not to press"). Thus, a federal court may not assume that it has Article III jurisdiction and then proceed to resolve the merits of a dispute. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998). Given these settled rules, the Court does not believe it is appropriate to treat a jurisdiction-negating lack of adversity as a merits issue, and the Court declines to follow the cases that have done so.[8]

---

[8] The most influential case to treat the lack of adversity issue as one related to the merits of a Section 1983 claim against a judge rather than as a subject matter jurisdiction question

The Court's bottom line conclusion is this: a federal court lacks Article III subject matter jurisdiction over a Section 1983 claim against a state judge in which the plaintiff challenges the constitutionality of a state statute that the judge construed and applied in an adjudicatory capacity. Such an action presents no Article III case or controversy because the interests of the judge are not adverse to those of the plaintiff.

## IV

The dispositive question here is: was Judge Lane acting in an adjudicatory capacity when she construed and applied the PPO Statute in the proceedings involving Lindke? As explained below, she was. Thus, Judge Lane's interests here are not adverse to Lindke's interests in challenging the PPO Statute, and Lindke's claims against Judge Lane present no justiciable Article III case or controversy**.** The Court therefore lacks subject matter jurisdiction over those claims.

### A

The PPO Statute assigns a "classically judicial function" to the state court judges who preside over personal protection order proceedings and enter personal protection

---

is *In Re Justices*, *supra*. (At least two of the other courts that adopt that approach expressly follow *In Re Justices*. *See Grant*, 15 F.3d at 147-48 and *Allen*, 861 F.3d at 443 n.49.) It is fair to question whether the First Circuit would treat the lack of adversity in the same way if *In Re Justices* was decided today. At the time *In Re Justices* was decided, some courts of appeals had been applying a doctrine known as "hypothetical jurisdiction." *Steel Co*., 523 U.S. at 94-95. Under that doctrine, the courts would assume that they had jurisdiction and would resolve disputes on the merits if the merits questions were substantially easier to resolve than the jurisdiction questions. *See id.* But the Supreme Court disapproved of that doctrine in *Steel Co. See id.* at 101-02. Had the Supreme Court decided *Steel Co*. before the First Circuit decided *In Re Justices*, it is possible, if not likely, that the First Circuit would have treated the lack of adversity as an Article III issue.

orders. *Mackey v. Berryman*, 2019 WL 197000, at *5 (E.D. Mich. Jan. 15, 2019) (dismissing action brought against state court judge arising out of granting of a personal protection order). The statute directs judges to entertain claims brought by petitioners (and does not permit judges to initiate protection proceedings themselves), to evaluate evidence presented by the petitioners, to hold hearings if requested by a respondent, to make findings, and to issue written orders. *See* Mich. Comp. Laws § 600.2950a(1), (7), (11), and (12). This is the "bread and butter" of adjudicating.

When Judge Lane presided over the litigation between Troy and Lindke, she performed the adjudicatory functions required by the PPO Statute. She presided over proceedings initiated by Troy. She evaluated the evidence that Troy submitted with the PPO Petition and determined that that evidence met the legal standards for the issuance of an *ex parte* personal protection order under Michigan law. She made findings in support of and gave reasons for issuing the PPO – *i.e.*, that Lindke had "target[ed Troy] on social media on numerous occasions" and "sen[t her] messages thru Facebook Messenger" (PPO, ECF No. 21-3, PageID.1033.). Then, once Lindke filed a motion to terminate the PPO, Judge Lane presided over an evidentiary hearing, swore in both Troy and Lindke, heard testimony and accepted evidence presented by Troy, and entertained legal argument from counsel for both Troy and Lindke. Finally, Judge Lane issued a written decision amending and limiting the PPO, and in that decision, she explained the legal reasoning for her ruling. (*See* St. Ct. Decision and Order, ECF No. 29-2.)

Because Judge Lane took all of these actions as an adjudicator of Troy's claim under the PPO Statute, she has no interests here that are adverse to Lindke's interests in

challenging that statute.[9]  Thus, there is no Article III case or controversy with respect to Lindke's claims against Judge Lane, and the Court must dismiss them.

## B

Lindke counters that there is an Article III case or controversy with respect to Judge Lane because she was not acting as a neutral adjudicator when she construed and applied the PPO Statute.  He insists that, instead, she was acting as "the state official responsible for *enforcing* the [PPO Statute]" (Lindke Supp. Br., ECF No. 73, PageID.3041; emphasis in original).  Lindke asserts that Judge Lane was the enforcer of the PPO Statute because she presided over the proceedings instituted by Troy and issued an order under the statute that restricted Lindke's behavior (*i.e.*, the PPO). (*See id.*)  Lindke says that because Judge Lane enforced the PPO Statute, she does have interests that are adverse to his.  The Court disagrees.

## 1

Courts have repeatedly rejected Lindke's argument that a judge becomes an interested enforcer of a statute – as opposed to a neutral adjudicator of claims brought under a statute – on the basis that the judge presided over proceedings and issued orders under that statute. The decision in *Nollet v. Justices of the Trial Court of the Commonwealth of Massachusetts*, 83 F.Supp.2d 204 (D. Mass. 2000), *aff'd* 248 F.3d 1127 (Table) (1st Cir.

---

[9] Moreover, Judge Lane does not have "a personal or institutional stake on either side of the constitutional controversy." *In re Justices*, 695 F.2d at 21.  She played "no role in the [PPO Statute's] enactment," and she has "no institutional interest in following [her] prior decisions (if any) concerning [the PPO Statute's] constitutionality if an authoritative contrary legal determination [had] been made." *Id.*

2000), is directly on point.  In *Nollet*, a group of plaintiffs who "had been litigants in domestic relations and/or abuse prevention matters" in the Massachusetts state courts filed suit against, among others, "345 state court judges." *Id.* at 206. The plaintiffs sought declaratory and injunctive relief declaring Massachusetts General Law Chapter 209A – a Massachusetts abuse protection law similar to the PPO Statute here – "unconstitutional because it permitt[ed] the granting of temporary restraining orders at *ex parte* hearings." *Id.*  The federal district court held, among other things, that the plaintiffs had failed to state a viable claim against the state judges "because the judicial defendants are being required to defend actions taken *in their adjudicatory capacity*…." *Id.* at 211 (emphasis added).  The court explained that the state judges were acting as adjudicators rather than enforcers even though the challenged statute authorized the judges to enter restraining orders against the plaintiffs:

> While Chapter 209A gives the judges of the Massachusetts trial courts wide latitude in fashioning the conditions of both temporary and permanent restraining orders, the judicial defendants are not acting in either an enforcement, administrative or legislative capacity when they consider the merits of a 209A petition. *See In re The Justices*, 695 F.2d at 22–25 (discussing a judge's adjudicatory role, as compared to other roles that a judge might have that would not be barred from such a suit). The judicial defendants are acting merely as adjudicators under Chapter 209A because the statute neither confers upon them the power to initiate actions, nor does it delegate to them any administrative functions. *See id.*  Only a person who is suffering from abuse is authorized to bring an action for a restraining order. The judicial defendants are merely authorized to decide the merits of each complaint and to formulate the appropriate remedy in each individual case.

*Id.* at 211 (internal citations omitted).  The district court dismissed the plaintiff's claims, and the First Circuit affirmed the district court's ruling.  That court "agree[d] … with the district court's ultimate conclusion" that the state judges were acting "purely in [an] adjudicative capacity." *Nollet*, 248 F.3d 1127, at *1 (citing *In re Justices)*.[10]

The Third Circuit in *Brandon E ex rel. Listenbee v. Reynolds*, 201 F.3d 194 (3d Cir. 2000) likewise concluded that judges were adjudicators, not enforcers, when acting under a statute that had important similarities to the PPO Statute. In *Reynolds*, three minors brought suit against several state court judges "challenging the constitutionality of Act 53, a Pennsylvania statute …. [that] allow[ed] a minor's parents or a legal guardian … to petition the court of common pleas of the judicial district in Pennsylvania where the minor [was] domiciled to order the involuntary commitment of the minor child to a drug and alcohol treatment program." *Id.* at 195.  "The defendants [were] county judges responsible for presiding over Act 53 cases," and they were sued in their official capacities. *Id.*  "The district court dismissed the action on the ground that the judges, as 'neutral adjudicators' [were] not the proper parties to defend the constitutionality of [Act 53]," and the Third

---

[10] *Nollet* treated the lack of adversity issue as going to the merits of the plaintiff's Section 1983 claim rather than as an Article III issue (as the Court treats the lack of adversity). *Nollet* (and other cases taking the same approach as *Nollet*) is nonetheless instructive on the issue of whether Judge Lane acted as a neutral adjudicator or an enforcer of the PPO Statute.  The analysis of that question does not differ between cases treating the lack of adversity as an Article III issue and those treating it as a merits issue.  The method of analysis in these two separate lines of cases substantially overlaps, and the cases differ primarily with respect to the basis of dismissal. *See Brandon E ex rel. Listenbee v. Reynolds*, 1999 WL 98585, at *8 (E.D. Penn. Feb. 25, 1999) (explaining that "the proper party analysis under § 1983 and case or controversy analysis" under Article III are "parallel[]" and likely would lead to the same result).

Circuit affirmed. *Id.*   The Third Circuit agreed that the judges were acting in an adjudicatory capacity:

> Turning to the present case, the facts reveal that the plaintiffs are suing judges who are neutral adjudicators and not enforcers or administrators. In presiding over Act 53 petitions, the judges do not initiate the proceedings against the minor. The proceedings must be undertaken by the minor's parent or legal guardian by filing a petition setting forth "sufficient facts and good reason for the commitment." *See* 71 Pa. Cons.Stat. Ann. § 1690.112a(a). To emphasize the informality of the proceedings and minimize their adversarial character, the petition does not require an attorney at law or a prosecuting attorney. Judges, however, are required to appoint counsel for the minor and order an assessment of his or her alleged drug or alcohol dependency. *See* 71 Pa. Cons.Stat. Ann. § 1690.112a(b). When the assessment has been completed, the statute requires the judge to hold a hearing and make factual determinations. *See* 71 Pa. Cons.Stat. Ann. § 1690.112a(c). The judge must determine whether the minor is a "drug-dependent person," a mixed question of law and fact typical to the adjudicative setting. *See id.* The judge must also determine whether the minor is unwilling or unable to accept voluntary treatment services. *See id.* Finally, the judge must determine whether the minor will benefit from involuntary treatment services. *See id.*
>
> The judge's position in the Act 53 proceeding is simply not adverse to that of the minor, even though the Commonwealth or the County is not required to have counsel present.

*Id.* at 199.

Finally, in *Fellows v. Raymond*, 842 F.Supp. 1470 (D. Maine 1994), the court held that a state judge acted as a neutral adjudicator, not an enforcer of a statute, when entering *ex parte* orders under the statute. The plaintiff in *Fellows* "challenge[d] the constitutionality of Maine's temporary guardianship statute." *Id.* at 1470. "To do so, he [] sued [a state court probate judge] to enjoin him from applying the statute." *Id.* The district court concluded

that dismissal of the plaintiff's suit was required because the judge was a neutral adjudicator under the statute:

> Judge Raymond's action in appointing Mrs. Fellows as the temporary guardian of her husband fits the classic adjudicative pattern. It is true that Judge Raymond acted *ex parte* (as the statute permitted him to do), but he acted only after a petition had been filed before him and he then proceeded to apply the Maine statute. Judge Raymond has no adverse legal interest with respect to Mr. Fellows, nor in general with respect to persons who are asserted to be incapacitated. Nor does he have a personal or institutional stake in the constitutionality of the Maine statute. He did not promulgate nor initiate on his own the enforcement of any court rule. His role in the temporary guardianship appointment under section 5–310 was solely that of an adjudicator, making him an improper party under the caselaw I have discussed.

*Id.* at 1471.

As these cases make clear, Judge Lane did not become an enforcer of the PPO Statute – with interests adverse to Lindke – simply because she presided over proceedings initiated by Troy and issued an order under the statute restricting Lindke's rights. Instead, Judge Lane was acting in a purely adjudicative capacity when she construed and applied the PPO Statute.

**2**!

Lindke says that two cases – *Georgevich v. Strauss*, 772 F.2d 1078 (3d Cir. 1985) and *Nichols v. Sivilli*, 2014 WL 7332020 (D.N.J. Dec. 19, 2014) – support his contention

that Judge Lane acted as an enforcer of the PPO Statute and thus has interests here that are adverse to him.  The Court respectfully disagrees.

In *Georgevich*, a class of prisoners who were serving sentences of less than two years in custody challenged a Pennsylvania statute that governed how those prisoners could be granted parole.  *See Georgevich*, 772 F.2d at 1082.  At the time of the plaintiffs' suit, parole decisions were split between two bodies: the Pennsylvania Board of Probation and Parole (the "Parole Board") and sentencing judges. *See id.* at 1082-1083.  The Parole Board was authorized to grant parole to prisoners who were serving sentences of longer than two years.  *See id.*  Parole decisions of prisoners serving sentences of less than two years were made by the sentencing judge. *See id.*  In addition, Pennsylvania law differentiated between prisoners in state facilities and those in county facilities. *See id.*  Pennsylvania law provided "parole procedures" for inmates in county facilities but did not for those in state custody. The plaintiffs in *Georgevich* were imprisoned in state facilities, and they claimed that "they [had] not been afforded parole procedures granted by state statute to similarly situated prisoners serving less than two year sentences in county prisons." *Id.* at 1082.  The plaintiffs named as defendants several state court judges responsible for the plaintiffs' parole determinations. *See id.*  The district court ultimately granted summary judgment in favor of the judges based on the plaintiffs' failure to exhaust their state court remedies. *See id.* at 1085.

On appeal, the judges "suggest[ed] that the district court's dismissal [was] independently justified on the ground that the judicial class [was] not a proper party." *Id.* at 1087.  They insisted that "there [was] no case or controversy" because "they ha[d] no

personal interest in the outcome of th[e] litigation that is sufficiently adverse to plaintiffs'
position.  [The judges] maintain[ed] that as judges, they [were] not responsible for the
constitutional deprivations complained of, nor are they able to implement, in their judicial
capacities, the relief requested." *Id.*

The Third Circuit disagreed.  The court explained that under Pennsylvania law, the
judges played an administrative, rather than judicial, role with respect to the parole
determinations at issue.  More specifically, because Pennsylvania law "divide[d] the
authority to make parole decisions between the sentencing judges and the [Parole] Board,"
the court held that there was "no basis for distinguishing the role of sentencing judges from
that of the [Parole] Board" with respect to the procedures plaintiffs received when seeking
parole.  Stated another way, the statute made both judges and the Parole Board
"administrators of the parole power." *Id.*  And it was in that capacity as administrators that
the plaintiffs had sued the judges.  As the Third Circuit stressed, the action could proceed
against the judges because "[t]his is *not* a case in which judges are sued in their judicial
capacity as neutral adjudicators of disputes." *Id.* (emphasis added).

*Georgevich* does not apply here because, as explained in detail above, Judge Lane
was acting as a neutral adjudicator, not an administrator or enforcer of a statute, when she
presided over the PPO proceedings involving Lindke.  Indeed, the Third Circuit itself has
repeatedly recognized that *Georgevich* does not apply where, as here, a "judge acted as an
adjudicator rather than an enforcer or administrator of a statute." *Allen*, 861 F.3d at 441
(quoting *Reynolds,* 201 F.3d at 199).

The Court is also not persuaded by Lindke's reliance on *Nichols*.  In *Nichols*, a reporter brought a First Amendment challenge to a gag order issued by a state court judge. *See Nichols*, 2014 WL 7332020, at *1.  The gag order prevented the parties involved in divorce litigation from "discuss[ing] their divorce or related litigation with other individuals" and from "conveying such information on social media." *Id.* at *2.  A reporter, who wanted to interview one of the parties about his experiences in family court, then filed a federal suit against the judge and alleged that the judge entered the gag order "without conducting any meaningful weighing of the First Amendment interests at stake.  According to [the reporter, the judge] did not hold a plenary hearing and made no specific findings as to why a gag order was required in this particular case." *Id.*

The judge then moved to dismiss.  She argued, among other things, that the federal court "lack[ed] jurisdiction" because the reporter had "failed to satisfy Article III's 'case or controversy' requirement." *Id.* at *3.  The judge insisted that she and the reporter did "not possess the adverse legal interests needed to satisfy Article III's case or controversy requirements because [the judge] entered the [g]ag [o]rder as a 'detached adjudicator' and there 'ha[d] no interest in upholding it.'" *Id.*

The court in *Nichols* disagreed.  It held that because the judge was "responsible" for enforcing the gag order, "it cannot be said that her relationship to the [gag order] is merely adjudicative." *Id.*  In addition, the court found it "significant" that the judge "drafted the terms of the [g]ag [o]rder." *Id.* at *4.  The court concluded that because the gag order was "a product of [the judge's] creation," the judge had a "personal stake" in the constitutional challenge. *Id.*

The Court concludes that *Nichols* does not provide strong support for Lindke's position here for several reasons. First, the case is distinguishable on its facts. The claim in *Nichols* did not involve a challenge to a statute that had been construed by the defendant-judge; instead, the plaintiff challenged a gag order that the judge had issued. Second, it is unclear from the facts described by the court in *Nichols* whether the defendant-judge had entered the gag order in the underlying case on her own initiative or whether a party petitioned for that order. The absence of that information is significant because, as described above, whether a judge initiated legal proceedings may be a significant factor in determining whether the judge acted as an adjudicator or enforcer. Third, multiple courts have held that *Nichols* does not apply where, as here, one of the parties to underlying state litigation brings a Section 1983 action against a state judge who acted in an adjudicatory capacity:

> Unlike the third-party reporter in *Nichols*, Malhan and Quinlan were parties to the litigation in which the gag and weapons orders were entered against them, respectively. Plaintiffs' interpretation of Section 1983 – that any litigant aggrieved by any order of a trial court may file a complaint against the judge who issued it, merely because the judge could "enforce" his or her own order – would turn our court system completely on its head. Indeed, if that were the rule, it is likely that federal district courts would be inundated with Section 1983 suits collaterally attacking judges' orders so as to avoid the more deferential review those orders might receive in appellate courts. Instead, when a judge presiding over a case – and acting in an adjudicative capacity – has entered an order which a litigant believes violates his or her constitutional rights, or is otherwise incorrect or unjust, that litigant should either seek interlocutory review of the order or appeal the order when it becomes final.

*Allen v. DeBello*, 2016 WL 1670927, at *16 (D. N.J. Apr. 27, 2016).  *See also Family Civil Liberties Union v. State*, 386 F.Supp.3d 411, 436 and n.11 (D. N.J. 2019) (declining to follow *Nichols* and holding that judges were not "adversary parties" and were not "proper parties" to action challenging "the manner in which the New Jersey state courts make custody determinations").

**3**

Lindke makes several additional arguments as to why he may proceed with his claim against Judge Lane, but none of these arguments persuade the Court that he may do so.

First, Lindke suggests that binding Sixth Circuit precedent supports his effort to sue Judge Lane.  He writes: "A constitutionally-harmed party may sue any state official on an *Ex Parte Young* theory, including 'the judges, if not immune themselves, for their part in carrying out the alleged harm. *McNeil v. Community Probation Servs., LLC*, 945 F.3d 991, 996 (6th Cir. 2019)." (Lindke Supp. Br., ECF No. 73, PageID.3038.)  But *McNeil* does not support Lindke's claim here.  *McNeil* did not involve a claim against a judge; instead, the plaintiff brought a claim against a county sheriff.  And while the Sixth Circuit recognized the possibility that, in some limited circumstances, a plaintiff "might" be able bring a Section 1983 claim against a judge, *id.* at 996, as discussed above, the court then noted that in earlier decisions, it had "favorably" cited the "position" that "there is usually no case or controversy between judges acting as adjudicators and litigants displeased with litigation outcomes." *Id.* at 996-97.  At best, it was "unclear" in *McNeil* whether the plaintiff could have named any state court judges as defendants. *Id.* at 996.  *McNeil* therefore does not authorize Lindke's claim against Judge Lane here.

34

Lindke next highlights that his claim for relief against Judge Lane is not barred by *Ex Parte Young*, 209 U.S. 123 (1908). (*See* Lindke Supp. Br., ECF No. 73, PageID.3038.) But even if that is true, it does not mean that the Court has subject matter jurisdiction over the claim.  *Ex Parte Young* did not give plaintiffs a blank check to sue state judges and other state officials in federal court.  Instead, that decision "carved out an exception to the States' constitutional immunity from suit, one that permits federal courts to enjoin state officials from the future enforcement of state legislation that violates federal law." *Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005).  Thus, to say that *Ex Parte Young* does not bar a claim is to say only that the defendant may not raise an Eleventh Amendment immunity defense to the claim.  And critically, even where *Ex Parte Young* is no bar to a claim against a state judge, the judge may have other substantial defenses to the claim – including defenses based on a lack of adversity between the parties. *See, e.g.*, *Silver v. Court of Common Pleas of Allegheny County*, 2018 WL 6523890, at **13-14 (W.D. Penn. Dec. 12, 2018) (holding that "although *Ex Parte Young* authorizes a suit for prospective injunctive or declaratory relief against a state official," dismissal of claim against state judge was required because, among other things, the judge "engaged in quintessential judicial functions" in underlying litigation and thus was not adverse to the plaintiff).  Simply put, the fact that Lindke is not adverse to Judge Lane requires dismissal of his claims even if, as he argues, the claims are not barred by *Ex Parte Young*.

Lindke also seems to suggest that he may proceed with his claims against Judge Lane because he has sued her in her official capacity rather than in her individual capacity. (*See* Lindke Supp. Br., ECF No. 73, PageID.3038; *see also* Sec. Am. Compl. at ¶¶ 13-16,

ECF No. 21, PageID.995-996.)   But that does not cure the lack of adversity between himself and Judge Lane.  An official capacity suit against a judge is treated as a suit against the court on which that judge sits. *See*, *e.g.*, *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (explaining that where a judge was "sued in [his] official capacity" the "only true defendant[]" was the county court that "employed [the judge]"); *Ward v. City of Norwalk*, 640 F. App'x 462, 466 (6th Cir. 2016) (explaining that claim brought against judge in his official capacity "as [an] employee[] of the Norwalk Municipal Court" is "treated as [a] suit[] against the Municipal Court").   Here, the St. Clair County Circuit Court has no interest with respect to the PPO Statute that is adverse to Lindke's interests.   Thus, the official capacity nature of Lindke's claims does not save them.

Finally, Lindke says that this Court may not properly dismiss his claims against Judge Lane without "identify[ing] *who* is the state official, other than [Judge] Lane, that enforces the [PPO Statute] and would be the proper party to sue." (Lindke Supp. Br., ECF No. 73, PageID.3041 n.5; emphasis in original.)  But Lindke "do[es] not offer any support for the assertion that [Judge Lane or the Court] was required to assist [him] in this way or otherwise litigate on [his] behalf by identifying possible defendants to sue." *Allen*, 861 F.3d at 442 n.48.  It is not the Court's job to speculate and/or offer an advisory opinion about whom Lindke may sue or provide him guidance on how he may otherwise challenge the constitutionality of the PPO Statute. *See id.*

**V**

The Court concludes that there is no Article III case or controversy with respect to Lindke's claims against Judge Lane because Judge Lane's interests here are not adverse to those of Lindke.  The Court therefore **GRANTS** Judge Lane's motion to dismiss (ECF No. 29) and **DISMISSES** the claims against her **WITHOUT PREJUDICE**.[11]

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 3, 2021


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 3, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764

---

[11] There may be an additional Article III problem with Lindke's claims against Judge Lane: mootness.  "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Hodges v. Schlinkert Sports Associates, Inc.*, 89 F.3d 310, 312 (6th Cir. 1996) (internal quotation marks omitted).  Here, it is not clear that the PPO issued by Judge Lane, as amended, has any continuing force or effect following the Michigan Court of Appeals' decision in Lindke's appeal.  Moreover, the PPO, by its own terms, has now expired.  Finally, there has been at least some suggestion that (1) the modification and/or expiration of the PPO must be noted in the L.E.I.N. system and (2) there is no longer any reference to the PPO in the L.E.I.N. system because those references are deleted from the L.E.I.N. one year after the expiration of the underlying PPO. (*See* Donnellon Mot. to Dismiss, ECF No. 34, PageID.2201; Judge Lane Supp. Br., ECF No. 34, PageID.3054 n.2.)  For these reasons and others, there may no longer be a "live" controversy with respect to the PPO.  Because the Court resolves the case on the basis of the other Article III subject matter jurisdiction ground above, it need not reach, and does not reach, this additional Article III question.