UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN LINDKE,

      Plaintiff,

                                        Case No. 19-cv-11905

v.                                   Hon. Matthew F. Leitman

MAT KING, *et al.*,

      Defendants.

_____/

### ORDER (1) GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS BY DEFENDANTS MAT KING AND DALE KAYS (ECF No. 96) AND (2) GRANTING MOTION TO DISMISS BY DEFENDANT TINA TROY (ECF No. 112)

In this action, Plaintiff Kevin Lindke alleges that certain provisions of Michigan's Non-Domestic Personal Protection Order statute, Mich. Comp. Laws § 600.2950a (the "PPO Statute"), as "authoritatively construed" by the Michigan courts, violate the First and Fourteenth Amendments to the United States Constitution. (Third Am. Comp., ECF No. 92, PageID.3161-3171.) In his Third Amended Complaint, Lindke seeks a declaration that the provisions at issue are unconstitutional, an injunction prohibiting enforcement of the provisions, and an award of nominal damages. Lindke brings his claims under 42 U.S.C. § 1983, and he has named the following individuals as Defendants: Mat King, the St. Clair County Sheriff; Dale Kays, an employee with St. Clair County Central Dispatch;

and Tina Troy, a woman who obtained a personal protection order ("PPO") against him (Lindke) under the PPO Statute.

King and Kays have now moved to dismiss Lindke's claims against them. (*See* Mot. to Dismiss, ECF No. 96.)  They argue that the Court lacks subject-matter jurisdiction over Lindke's claims for declaratory and injunctive relief because those claims are moot, and they contend that Kays has qualified immunity from Lindke's claim for nominal damages (which he did not seek against King).  For the reasons explained below, their motion is **GRANTED IN PART** and **DENIED IN PART**.

Troy has also moved to dismiss the claims against her. (*See* Mot. to Dismiss, ECF No. 112.)  She argues that she is not a state actor and thus is not subject to suit under Section 1983.  The Court agrees.  Therefore, Troy's motion to dismiss is **GRANTED**.

## I

### A

Lindke's challenge to the PPO Statute arose out of a dispute between (1) Lindke, (2) the mother of Lindke's daughter (a woman whose initials are A.M.), and (3) a woman named Tina Troy. (*See* Third Am. Compl. at ¶¶ 8-9, ECF No. 92, PageID.3148.)  Troy is the maternal great-aunt of Lindke's daughter. (*See id*. at ¶8, PageID.3148.)

Lindke and A.M. have been engaged in a "heated and contested child custody battle" for several years. (*Id.* at ¶9, PageID.3148.)  Lindke says that the "heart" of the dispute is that certain members of A.M.'s family, including Troy, have allowed his daughter to "come into regular contact with a twice-convicted sex offender." (*Id.* at ¶10, PageID.3149.)

According to Lindke, there is a Facebook page called "Through My Eyes" that "features political and opinion commentary about" the "actions" and "failures" of A.M.'s family. (*Id*. at ¶¶11-12, PageID.3149.)  Lindke posted entries about Troy and other members of A.M.'s family on this Facebook page. (*See id.* at ¶¶ 15, 33, PageID.3149, 3155.)  In addition, according to Troy, Lindke sent her direct messages through Facebook. (*See* ECF  92-1, PageID.3180.)

Troy felt threatened and harassed by Lindke's posts and messages.  Therefore, on March 4, 2019, Troy filed an *ex parte* petition for a PPO against Lindke in the St. Clair County Circuit Court. (*See* PPO Pet., ECF No. 92-1.)   The proceedings surrounding Troy's petition for a PPO are described in greater detail below.

**B**

In order to better understand both the PPO proceedings and Lindke's claims in this action, it is helpful to begin with a brief overview of the relevant provisions of the PPO Statute and how those provisions had been construed by the Michigan Court of Appeals at the time Troy sought a PPO against Lindke.

3

**1**

The PPO Statute authorizes "an individual" to "petition the family division of circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under section 411h, 411i, or 411s of the Michigan penal code, 1931 PA 328, [Mich. Comp. Laws §§] 750.411h, 750.411i, and 750.411s." Mich. Comp. Laws § 600.2950a(1).   The three sections of the Michigan penal code referenced in the PPO Statute prohibit different types of stalking.  Section 411h prohibits "stalking," which it defines as a "willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Mich. Comp. Laws § 750.411h(1)(d).  "Stalking" under Section 411h includes sending unwanted "electronic communications" to a person if those communications otherwise satisfy the statutory definition. Mich. Comp. Laws § 750.411h(1)(d).

Section 411i prohibits "aggravated stalking."  "Aggravated stalking" is "stalking" (as defined by Section 411h) that is, among other things, accompanied by a "credible threat" or committed in violation of a condition of parole or probation. Mich. Comp. Laws § 750.411i(2).

Finally, Section 411s prohibits what has come to be known as "cyberstalking by proxy." This type of stalking – which the Court describes in much greater detail below – involves posting an electronic message about a person that leads other individuals to have unconsented and harassing contact with that person.

In Troy's petition for a PPO, she alleged that Lindke committed all three types of stalking. (*See* PPO Pet., ECF No. 92-1, PageID.3180.[1]) However, as described in detail below, the state court judge who presided over the PPO proceedings ultimately found only that Lindke had committed cyberstalking by proxy and issued a PPO barring him from posting messages about Troy on social media. For that reason, and given the nature of Lindke's claims (which are also described in detail below), the only type of stalking that is relevant to this action is cyberstalking by proxy in violation of Section 411i. The Court therefore turns next to a detailed review of Section 411i and the conduct it prohibits.

---

[1] Lindke alleges that Troy's petition for a PPO was "solely premised on [the] speech [Lindke had] made [about Troy] via Facebook." (Third Am. Compl. at ¶15, ECF No. 92. PageID.3150.) That is inaccurate. The petition, which is attached to Lindke's Third Amended Complaint (and thus can be considered by the Court when reviewing King's and Kays' motion to dismiss), stated that Troy was also seeking a PPO based upon her receipt of direct Facebook messages from Lindke. (*See* PPO Pet., ECF No. 92-1, PageID.3180)

**2**

In relevant part, Section 411s provides as follows:

(1) A person shall not post a message through the use of any medium of communication, including the internet or a computer, computer program, computer system, or computer network, or other electronic medium of communication, without the victim's consent, if all of the following apply:

    (a) The person knows or has reason to know that posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim.

    (b) Posting the message is intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested.

    (c) Conduct arising from posting the message would cause a reasonable person to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

    (d) Conduct arising from posting the message causes the victim to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

           ***

(6) This section does not prohibit constitutionally protected speech or activity.

           ***

(8) As used in this section:

*\*\**

    (g) "Emotional distress" means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling.

*\*\**

    (i) "Post a message" means transferring, sending, posting, publishing, disseminating, or otherwise communicating or attempting to transfer, send, post, publish, disseminate, or otherwise communicate information, whether truthful or untruthful, about the victim.

    (j) "Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued.

Mich. Comp. Laws § 750.411s.

    According to the Michigan Court of Appeals, Section 411s "is designed to prohibit what some legal scholars have referred to as 'cyberstalking by proxy' or 'cyberharassing by proxy.'" *Buchanan v. Crisler*, 922 N.W.2d 886, 895–96 (Mich. App. 2018). This theory of cyberstalking posits that:

    [It] is not the postings themselves that are harassing to the victim; rather, it is the unconsented contacts arising from the postings that harass the victim. In particular, the statute envisions a scenario in which a stalker posts a message about the victim, without the victim's consent, and as a result of the posting, others initiate unconsented contacts with the victim. These unconsented contacts, arising from the stalker's postings, result in the harassment of the

victim. In this manner, by posting a message that leads to unconsented contact, the stalker is able to use other persons to harass the victim.

For example, there have been cases of cyberstalking by proxy in which a stalker posts messages with sexual content about the victim and suggests that the victim is interested in sexual contact. *See, e.g.*, *United States v. Sayer*, 748 F.3d 425, 428 (C.A. 1, 2014). In that situation, third parties read the message and contact the victim, expecting sex. *See, e.g.*, *id. See also* O'Connor, *Cutting Cyberstalking's Gordian Knot*, 43 Seton Hall L. Rev 1007, 1009 (2013). In a somewhat more benign example, in a Massachusetts case, harassers posted false advertisements online, suggesting that the victims had something for sale or to give away for free; as a result of these advertisements, the victims received numerous phone calls and visits at their home about the items. *See Commonwealth v. Johnson*, 470 Mass. 300, 303-304, 21 N.E.3d 937 (2014). In each of these cases, the victim was harassed by the unconsented contacts that arose from the online postings. As written, MCL 750.411s is designed to address situations in which the victim is harassed by conduct arising from the posts.

*Id.* (internal footnotes omitted).

Prior to the time that Troy sought a PPO against Lindke, the Michigan Court of Appeals had issued two published decisions concerning the circumstances under which a trial court could issue a PPO to enjoin cyberstalking by proxy in violation of Section 411s. Those decisions were *Buchanan, supra*, and *TM v. MZ*, 926 N.W.2d 900 (Mich. App. 2018). Both decisions made clear that a circuit judge could not issue a PPO to prevent cyberstalking by proxy unless and until the judge *found both* that (1) a previous post by the respondent (against whom the PPO was sought)

amounted to cyberstalking by proxy in violation of Section 411s, *and* (2) the computer/internet postings to be enjoined by the PPO were not constitutionally-protected speech.  As the court in *Buchanan* explained:

> *In sum, to enjoin an individual from posting a message in violation of MCL 750.411s, there must first be a finding that a prior posting violates that statute.* This inquiry requires the trial court to make a factual determination regarding the elements of MCL 750.411s, focusing on the actor's intent in posting the message and the effect of the conduct arising from the message. *If it is determined that the actor has violated MCL 750.411s, the trial court should then consider the nature of the postings that will be restricted to ensure that constitutionally protected speech will not be inhibited by enjoining an individual's online postings.* MCL 750.411s(6). While the government has an interest in preventing the harassment of private individuals in relation to private matters, MCL 750.411s may not be employed to prevent speech relating to public figures on matters of public concern. Consequently, when it is asserted that the postings involve a matter of public concern, the court must consider the content, form, and context of the online postings to determine whether they involve constitutionally protected speech on a matter of public concern. *If the court determines that constitutionally protected speech will not be inhibited, posting a message in violation of MCL 750.411s may be enjoined under MCL 600.2950a(1).*

*Buchanan*, 922 N.W.2d at 886 (emphasis added).  Likewise, the court in *TM* stressed that "in order to warrant a PPO" to prevent cyberstalking by proxy, a circuit judge "ha[s] to find that [a] respondent's [internet] postings – his speech – [are] not constitutionally protected." *TM*, 926 N.W.2d at 907.

In *TM*, the Michigan Court of Appeals identified defamation as one type of "not constitutionally protected" speech that could be prohibited in a PPO aimed at cyberstalking by proxy. *See id.* at 909.  But the Court of Appeals stressed that under the modern legal trend, before a circuit court may enjoin defamatory cyberstalking by proxy through a PPO, it (the circuit court) must first find that the statements to be enjoined are "definitively false," and it must then "specifically limit[] any injunction [via the PPO] to the adjudicated speech." *Id.* at 911-12.

### 3

The PPO Statute also sets forth how an individual seeking a PPO should file for such relief and how the subject of a PPO (called the "respondent") may challenge it.  As noted above, the PPO Statute provides that an individual seeking a PPO must file a petition with the family division of the circuit court.  The petition may be filed with notice to the respondent or on an *ex parte* basis. *See* Mich. Comp. Laws § 600.2950a(12).

Where a petition is filed *ex parte*, a court may not enter a PPO against the respondent "unless it clearly appears from specific facts shown by a verified complaint, written motion, or affidavit that immediate irreparable injury, loss, or damage [would] result from the delay required to effectuate notice or the notice will precipitate adverse action before a personal protection order can be entered." *Id.* And where a court does issue an *ex parte* PPO, the respondent "may file a motion to

modify or rescind the personal protection order and request a hearing under the Michigan court rules … within 14 days after the order is served or after the individual restrained or enjoined receives actual notice of the personal protection order." Mich. Comp. Laws § 600.2950a(12).   A court that receives such a motion must "schedule a hearing on [the] motion … within 14 days after the motion … is filed." Mich. Comp. Laws § 600.2950a(13).

## C

The Court now returns to the facts of this case.  As described above, on March 4, 2019, Troy filed an *ex parte* petition for the issuance of a PPO against Lindke in the St. Clair County Circuit Court pursuant to the PPO Statute (the "PPO Petition"). (*See* PPO Pet., ECF No. 92-1.)   In the PPO Petition, Troy claimed that Lindke engaged in stalking by sending her "multiple" Facebook direct messages after she "told him to stop more than once." (*Id*.)   Troy also alleged that Lindke committed cyberstalking by proxy by posting internet messages that falsely accused her of "helping a violent sexual predator." (*Id*.)

## D

Troy's PPO Petition was assigned to Judge Cynthia A. Lane of the St. Clair County Circuit Court. (*See* Register of Actions, ECF No. 92-2, PageID.3181.)   On March 4, 2019, Judge Lane "issued [the] *ex parte* order as requested" by Troy (the

"Ex Parte PPO").  (Third Am. Compl. at ¶16, ECF No. 92, PageID.3151; *see also* Ex Parte PPO, ECF No. 92-3.)

In the Ex Parte PPO, Judge Lane made several – but not all – of the findings required by the PPO Statute (as construed by the Michigan Court of Appeals in *Buchanan* and *TM*).  First, she found that Troy had filed a valid petition "requesting an order to restrain conduct prohibited" by Section 411s of the penal code. (Lindke PPO, ECF No. 92-3, PageID.3185.)  Next, she found that it was appropriate to enter a PPO without advanced notice to Lindke because "irreparable injury, loss, or damage [would] result from the delay required to give notice or notice itself [would] precipitate adverse action before an order can be issued." (*Id.*)  Judge Lane then found that Lindke had "committed the following acts of willful, unconsented contact: Targeting [Troy] on social media on numerous occasions" and "[s]ending [Troy] messages thru Facebook Messenger." (*Id.*)  But Judge Lane did not make any finding concerning whether Lindke's conduct was protected speech under the First Amendment.

After making her findings, Judge Lane prohibited Lindke from, among other things, "sending mail or other communications to [Troy]" and "posting comments about [Troy] on social media." (*Id.*)  Judge Lane did not limit the prohibition on posting comments about Troy to statements that Judge Lane had found to be false or otherwise unprotected by the First Amendment. (*See id.*)

The Ex Parte PPO became "effective" immediately and remained in effect for one year – "until [March] 4, 2020." (*Id.*)  Judge Lane ordered the clerk of the court to "file [the Ex Parte PPO] with the St. Clair County Sheriff" so that the sheriff could enter the order into the Law Enforcement Information Network ("LEIN"). (*Id.*) Defendant Kays, acting "at the direction and command of" Defendant King, then entered the Ex Parte PPO into the LEIN system. (*See* Third Am. Compl. at ¶18, ECF No. 92, PageID.3151.)

**E**

On March 13, 2019, Lindke filed a motion in the St. Clair County Circuit Court to terminate the Ex Parte PPO. (*See* Register of Actions, 92-2, PageID.3181.) Lindke argued that "any and all communications attributable to [him] … [were] all protected first amendment activities." (Lindke Mot. to Terminate the Lindke PPO, ECF No. 92-8, PageID.2376.)  He also maintained that Troy's allegations that he was "attacking" and "targeting" her on Facebook were "completely baseless and wholly without merit." (*Id.*, PageID.3277.)

Judge Lane held an evidentiary hearing on Lindke's motion on March 21, 2019. (*See* Register of Actions, ECF No. 92-2, PageID.3182.)  Both Troy and Lindke appeared for the hearing. (*See id.*)  In addition, Troy provided testimony and presented evidence in support of the PPO Petition. (*See id.*)  Once the presentation of evidence was completed, Judge Lane continued the hearing for another date. (*See*

*id.*)  The date for the continued hearing was then rescheduled several times, often at Lindke's counsel's request or by stipulation. (*See id.*, PageID.3182-3184.)

On September 19, 2019, Judge Lane held a final hearing and heard "closing arguments" from the attorneys for both Troy and Lindke. (Register of Actions, ECF No. 29-3, PageID.1719.)  She then told the parties that she would issue a written decision on the motion. (*See id.*)

On October 28, 2019, Judge Lane issued a written decision granting in part and denying in part Lindke's motion to terminate the Ex Parte PPO. (*See* St. Ct. Decision and Order, ECF No. 29-2.)  In that decision, Judge Lane noted that under Michigan law, "[w]hen a Motion to Terminate a PPO is timely filed, the petitioner has the burden of justifying the continuation of the PPO." (*Id.*, PageID.1710.)  Judge Lane first concluded that Troy had not "demonstrated reasonable cause to believe that [Lindke] had engaged" in ordinary or aggravated stalking in violation of Sections 411h or 411i when he sent Facebook direct messages to her. (*Id.*, PageID.1711.)

But Judge Lane found that Troy did establish that Lindke had committed cyberstalking by proxy in violation of Section 411s by making "untrue postings" about her "for the purpose of harassing and causing others to harass [her]." (*Id.*, PageID.1711-1712.)  Judge Lane found as follows:

> MCL 750.411s prohibits posting of messages through the use of any medium of communication, including the

Internet, or other electronic medium of communication , without the victim's consent, if all of the items set forth in subsections (l)(a) through (d) apply. However, that statute does not prohibit constitutionally protected speech or activity. MCL 750.41ls (6). Defamatory statements are not constitutionally protected. As noted in the published case of *TM v. MZ*, 326 Mich App 227 (2018), there is a modern trend toward allowing injunctions of defamatory speech without a showing of damages. That modern trend requires a determination by a factfinder that the statements were definitively false and then specifically limits any injunction to the adjudicated speech. *Id.*

Here, Respondent made numerous postings on Facebook accusing the Petitioner of causing his daughter to have contact with a convicted sex offender. Those accusations were false and Respondent knew them to be false. He posted those allegations on several Facebook pages to which the public had access. In response, Petitioner received several messages asking her how she could engage in such behavior. Her employer also saw those postings and she was placed in danger of losing her job. She was constantly on alert, wondering what additional untrue allegations Respondent was going to post. Both the untrue postings made by Respondent and the contacts others made with Petitioner as a result of those postings were of a nature that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, or harassed and did in fact cause Petitioner to feel that way. In the Court's judgment, Respondent made these untrue postings for the purpose of harassing and causing others to harass Petitioner. Petitioner has therefore demonstrated reasonable cause to believe the Respondent has committed the acts prohibited by MCL 750.411s.

(*Id.*)

Judge Lane then issued an amended PPO that was narrower in scope than the

Ex Parte PPO (the "Amended PPO"). The Amended PPO "prohibit[ed Lindke] from

posting defamatory statements about [Troy] on social media and/or from publishing such statements about her elsewhere." (*Id.*, PageID.1712.)  Thus, the Amended PPO was not limited to the particular statements by Lindke that Judge Lane had found to be false.

**F**

Lindke then appealed to the Michigan Court of Appeals.  (*See*, *e.g.*, Third Am. Compl. at ¶ 31, ECF No. 92, PageID.3155.)  In that appeal, Lindke did not challenge Judge Lane's decision to issue the Ex Parte PPO.  Instead, he challenged only the Amended PPO. *See TT v. KL*, 965 N.W.2d 101, 104 (Mich. App. 2020) (noting that Lindke "appeal[ed] by right a *modified* nondomestic personal protection order (PPO) issued by the trial court under [the PPO Statute] following an evidentiary hearing on [Lindke's] motion to terminate the PPO") (emphasis added).)  Lindke argued, among other things, that (1) "his speech was [] constitutionally protected under the First Amendment" because "he did not commit a written defamation through any of his posts," and (2) the Amended PPO "constituted an unconstitutional prior restraint." *Id.* at 113-14.

The Michigan Court of Appeals decided Lindke's appeal on October 29, 2020. The court first noted that Lindke did not challenge Judge Lane's conclusion that he had committed cyberstalking by proxy in violation of Section 411s. *See id.* at 116. The court then affirmed Judge Lane's conclusion that the specific posts at issue –

16

*i.e.*, the posts about Troy allowing a convicted sex offender to have access to Lindke's daughter – were false and defamatory and thus could have been enjoined by a PPO. *See id.* at 118-19. The court said that Lindke's "posts on social media effectively asserted that [Troy] was allowing LW, a convicted sex offender, to have ongoing access to [Lindke's] daughter," and it held that "[t]here was simply no truth whatsoever in [Lindke's] Facebook posts regarding the actions and conduct of [Troy]." *Id.*

But the court nonetheless held that the Amended PPO "was inconsistent with the law." *Id.* at 121. The court explained that Judge Lane erred when she barred Lindke from "posting defamatory statements about [Troy] on social media and/or from publishing such statements elsewhere," because that prohibition was "much too broad and unconfined to the boundaries set in [Section] 750.411s." *Id.* at 120. Echoing *TM*, the court stressed that any PPO that is issued to prevent defamatory cyberstalking by proxy must "be specifically limited to the adjudicated speech." *Id.* Because the Amended PPO was not limited to Lindke's statements that Judge Lane had found to be false, the Michigan Court of Appeals vacated that order and "remand[ed] for proceedings consistent with this opinion." *Id.*

The Amended PPO expired on its own terms while Lindke's appeal was pending. And it does not appear that there has been any attempt to revive the Amended PPO on remand following the Michigan Court of Appeals' ruling.

## II

## A

On June 26, 2019, Lindke filed this action under 42 U.S.C. § 1983. (*See* Compl., ECF No. 1.)  Now before the Court is Lindke's Third Amended Complaint. (*See* Third Am. Compl., ECF No. 92.)  In that pleading, he claims that the Michigan Court of Appeals' construction of the PPO Statute "renders the statute unconstitutional as a form of prior restraint and contrary to the First Amendment." (*Id.* at ¶ 34, PageID.3155.)  He brings the following claims based upon the Michigan Court of Appeals' construction of the PPO Statute:

- Claim titled "Deprivation of Procedural Due Process." (*Id.*, PageID.3156.)  In this claim, Lindke alleges that the procedures governing the issuance of an *ex parte* PPO under the PPO Statute violate the Due Process Clause of Fourteenth Amendment because the statute allows a court to issue an *ex parte* PPO without "any prior written notice or the opportunity to be heard." (*Id.* at ¶ 38, PageID.3156-3157.)  Lindke asserts this claim against Defendants King, Kays, and Troy.  From this point forward, the Court will refer to this claim as the "Ex Parte PPO Due Process Claim."

- Claim titled "Prior Restraint by *ex parte* Order – Prior to First Hearing." (*Id.*, PageID.3168.)  In this claim, Lindke challenges the provision of

18

the PPO statute that permits a circuit court to issue an *ex parte* PPO that prohibits cyberstalking by proxy.  Lindke contends that this provision violates the First Amendment because it authorizes a circuit judge to enjoin a respondent's allegedly-defamatory speech about a PPO petitioner "without … first determining that the statements or posts were definitively false and without a final adjudication on the merits." (*Id.*, PageID.3169.)  According to Lindke, this amounts to an unlawful "prior restraint on an ex parte basis" that is "contrary to the First Amendment." (*Id.*)  Lindke brings this claim against Defendants King, Kays, and Troy.  From this point forward, the Court will refer to this claim as the "Ex Parte PPO First Amendment Claim."

- Claim titled "Prior Restraint (After Hearing)." (*Id.*, PageID.3161.)  In this claim, Lindke attacks the provision of the PPO statute that permits a circuit court, after holding a hearing, to continue an *ex parte* PPO that had been issued to prohibit cyberstalking by proxy.  Lindke says that this provision of the PPO statute violates the First Amendment because it authorizes circuit courts to (1) impose a prior restraint on a PPO respondent and (2) enjoin speech "about" a PPO petitioner that is "constitutionally protected." (*Id.* at ¶¶ 32-34, 63, 67, PageID.3162-63; *see also* Tr. 2/9/2023 at 10-11, ECF No. 122, PageID.3823-24.)  Lindke

brings this claim against Defendants King and Kays only. From this point forward, the Court will refer to this claim as the "Post-Hearing PPO Claim."

As relief for the alleged constitutional violations, Lindke asks the Court to:

> a. Issue a declaration against any/all Defendants that the non-domestic Michigan PPO statute creates illegal prior restraint of Plaintiff Kevin Lindke's First and Fourteenth Amendment freedoms of free speech and expression and any/all Defendants violated Plaintiff Kevin Lindke's First and Fourteenth Amendment freedoms of free speech and expression;
>
> b. Issue a declaration against any/all Defendants that the Michigan non-domestic PPO statute is unconstitutional as creating illegal prior restraint of Plaintiff Kevin Lindke's First and Fourteenth Amendment freedoms of free speech and expression and any/all Defendants violated Plaintiff Kevin Lindke's First and Fourteenth Amendment freedoms of free speech and expression;
>
> c. Issue a declaration the Michigan non-domestic PPO statute, facially and/or as applied, violates Plaintiff Kevin Lindke's procedural due process rights under the Fourteenth Amendment;
>
> d. issue an injunction against only Defendants Mat King and/or Dale Kays to enjoin any unconstitutional actions complained above and/or via the Michigan non-domestic PPO statute;
> e. Award $1.00 in nominal damages solely against Defendant Dale Kays in his personal capacity;
>
> f. Award $1.00 in total nominal damages solely against Defendant Tina Troy;

> g. Award Plaintiff all applicable interest, costs, and
> attorney fees pursuant to 42 U.S.C. § 1988 against
> Defendant Dale Kays (both capacities) and Defendant Mat
> King and only against Defendant Tina Troy if she actually
> appears and defend the constitutionality of the Michigan
> non-domestic PPO statute.

(*Id.*, PageID.3174-3175.)

Lindke says that the declaratory and injunctive relief he seeks are essential

because the PPO Statute, as construed by the Michigan Court of Appeals, is having

a chilling effect on his desire and intention to engage in constitutionally-protected

internet speech.  In Lindke's words:

> Plaintiff Kevin Lindke wanted/wants to, intended/intends
> to, and desired/desires to make constitutionally-protected
> statements and posts (*i.e.* speech) about Defendant Tina
> Troy and her family's involvement with allowing
> [Lindke's daughter] to come into regular contact with a
> twice-convicted sex offender, and discuss the involvement
> and failures of legal officers to protect [Lindke's daughter]
> on the Through My Eyes Facebook page, but fears to do
> so due to the prior restraints entered against him as
> described above and by the unknown threat of additional
> *ex parte* prior restraints being issued against him to be
> sought *ex parte* by Defendant Tina Troy.

(*Id.* at ¶ 28, PageID.3153.)

**B**

On June 10, 2022, King and Kays moved to dismiss all of Lindke's claims

under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* Mot. to Dismiss,

ECF No. 96.)  King and Kays argue that the Court lacks subject-matter jurisdiction

over Lindke's claims against them because the claims are moot and barred by the *Rooker-Feldman* doctrine. They also argue that Kays is entitled to qualified immunity from the claim for nominal damages against him in his personal capacity.

The Court held a hearing on the motion on February 9, 2023. (*See* Hr'g Tr., ECF No. 122.) During the hearing, the Court posed a number of questions to Lindke's counsel concerning whether the Michigan Court of Appeals has already construed the PPO Statute in a manner that avoids the First Amendment problems that Lindke claims to have identified with the statute. The Court believed that the answers to the questions would help the Court determine whether Lindke's claims presented a live controversy. It seemed to the Court that if the Michigan Court of Appeals has *already* limited the PPO statute in the ways that Lindke says are essential to ensure its constitutionality, then Lindke's request for an injunction and declaration imposing those same limits on the statute would not present a live case or controversy.

Lindke's counsel responded to the Court's line of questioning by suggesting, among other things, that the Court's questions concerned (at least in part) the merits of the parties' dispute rather than the jurisdictional issues raised in the pending motion to dismiss. He added that he had not spent substantial time before the hearing thinking about merits-related issues. Lindke's counsel asked for an opportunity to

22

submit a supplemental brief on the issues raised in the Court's line of questioning, and the Court agreed during the hearing to permit him to file such a brief.

Four days after the hearing, the Court issued a notice in which it informed the parties that "if it [] determined that the issues raised in its line of questioning [described above] go to the merits, rather than to its subject-matter jurisdiction," the Court would convert Defendants' motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) to a motion to dismiss under Rule 12(b)(6). (Order, ECF No. 118, PageID.3782.)  And the Court provided Lindke an opportunity to "modify his supplemental briefing in any way he sees fit in order to address the possibility that this Court will determine whether, for the reasons stated in its questions during the hearing, he has failed to state a viable First Amendment claim on the merits." (*Id.*, PageID.3782-3783.)  Lindke filed that brief on March 7, 2023. (*See* Lindke Supp. Br., ECF No. 120.)  The Court also provided the Defendants and the Michigan Attorney General, who has appeared in this case as an amicus curiae, the opportunity to file a brief "addressing whether, for the reasons raised by the Court during the hearing, Lindke has failed to state a viable First Amendment claim on the merits." (*Id.*, PageID.3783.)  Defendants filed their supplemental brief on March 22, 2023. (*See* Defs.' Supp. Br., ECF No. 123.)  The Attorney General filed her supplemental brief on March 28, 2023. (*See* Attorney General Supp. Br. ECF No. 124.)

On October 17, 2022, Troy filed her own motion to dismiss. (See Mot., ECF No. 112.)  The Court has concluded that it may resolve Troy's motion without holding a hearing. *See* Local Rule 7.2(f)(2).

### III

### A

Rule 12(b)(1) governs challenges based on a lack of subject-matter jurisdiction. *See Loren v. Blue Cross & Blue Shield of Michigan*, 505 F.3d 598, 607 (6th Cir. 2007).  Rule 12(b)(1) motions fall into two general categories: facial attacks and factual attacks. *See United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack "is a challenge to the sufficiency of the pleading itself." *Id.*  The court accepts a complaint's allegations as true and determines whether they establish federal jurisdiction. *See id.*  In contrast, when a motion raises a factual attack, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (internal citation omitted).

When a district court determines that a motion attacking its subject-matter jurisdiction presents issues going to the merits of the parties' dispute, the court may, after assuring itself that it does have subject-matter jurisdiction, convert the motion to one under Federal Rule of Civil Procedure 12(b)(6). *See Kerr v. Polis*, 20 F.4th 686, 700 (10th Cir. 2021) (converting a motion to dismiss for lack of subject-matter

jurisdiction under Rule 12(b)(1) to a motion to dismiss under Rule 12(b)(6) where arguments raised by defendants went to the merits of the plaintiffs' claims rather than to subject-matter jurisdiction).

Rule 12(b)(6) provides for dismissal of a complaint when a plaintiff fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.  A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 556.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**IV**

Defendants King and Kays argue that the Court lacks subject matter jurisdiction over this action for two reasons.  The Court addresses each reason separately below.

**A**

The Court begins with Defendants' argument that subject-matter jurisdiction is lacking because Lindke's claims have become moot.  The mootness arises, Defendants contend, from the fact that the Amended PPO has expired and is not readily accessible on the LEIN system. (*See* Mot. to Dismiss, ECF No. 96, PageID.3378.)  The Court disagrees with Defendants' assertion that the purported mootness of Lindke's claims requires dismissal of this action.

The principles governing Defendants' mootness arguments are well-established.  "Article III, § 2 of the United States Constitution vests federal courts with jurisdiction to address 'actual cases and controversies.'" *Thomas v. City of Memphis, Tennessee*, 996 F.3d 318, 323–24 (6th Cir. 2021).  Given this limited jurisdiction, federal courts are "prohibited from rendering decisions that do not affect the rights of the litigants." *Id.* (quotation omitted).  That means that a federal court may not decide a case that has become moot.  A case becomes moot "when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome." *Id.* (quotation omitted).  Stated another way, "the test for mootness is

whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006).

The mootness "doctrine, however, is not without its exceptions." *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 596 (6th Cir. 2014). Under one such exception, a case "will not be considered moot if the challenged activity is capable of repetition, yet evading review." *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005). This exception "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007).

Lindke's claims satisfy both elements of this exception. First, the state action that Lindke challenges – i.e., the issuance of PPOs that allegedly violate the First Amendment and Due Process Clause – does not last long enough to permit full federal review. That much is clear from both the evidence before the Court and from a review of Michigan appellate decisions involving the PPO Statute. These sources reveal that Michigan circuit courts almost universally issue PPOs that last for a term of one year or less – just as Judge Lane did in the underlying PPO action here. (*See, e.g.*, Judge Lane 11/27/2017 PPO, ECF No. 92-13, PageID.3340; Judge Brown 8/14/2018 PPO, ECF No. 92-14, PageID.3341; Judge Brown 2/12/2018 PPO, ECF

No. 92-15, PageID.3343.)[2] The Supreme Court and the Sixth Circuit have repeatedly held that such a time frame is too short to permit full federal review. *See, e.g.*, *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 774 (1978) (18–month period too short); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515 (1911) (2–year period too short); *Turner v. Rogers*, 564 U.S. 431, 439-440 (2011) (12-month period too short).

Second, the evidence in the record confirms that there is a reasonable likelihood that Lindke will again be subject to a PPO that limits his ability to make public statements about A.M. and her family, including Troy. Lindke has submitted an affidavit in which he states that remains concerned that A.M. and her family are exposing his child to undue risks and that he desires to continue to publicly comment about their actions. (*See* Lindke Decl., ECF No. 102-5, PageID.3615.) Moreover, the record contains numerous contempt motions that Troy filed against Lindke in the underlying PPO proceedings based upon his internet speech about her. (*See* 3/6/2019

---

[2] *See also, e.g.*, *PLT v. JBP*, 2019 WL 7206134, at *2 (Mich. Ct. App. Dec. 26, 2019) (describing PPO that expired after one year); *Dukes v. Hampton*, 2009 WL 3366249, at *1 (Mich. Ct. App. Oct. 20, 2009) (same); *Lipscombe v. Lipscombe*, 2010 WL 395762, at *1-*2 (Mich. Ct. App. Feb. 4, 2010) (same); *CRB v. SAB*, 2022 WL 815374, at *1 (Mich. Ct. App. Mar. 17, 2022) (same); *Cooke v. Scheere*, 2013 WL 951393, at *1 (Mich. Ct. App. Feb. 19, 2013) (same); *B.S. v. J.B.*, 2019 WL 6977840, at *1 (Mich. Ct. App. Dec. 19, 2019) (same); *RS v. AH*, 2020 WL 6816969, at *3 (Mich. Ct. App. Nov. 19, 2020) (same); *In re JDJ*, 2021 WL 17725808, at *1 (Mich. Ct. App. Dec. 15, 2022) (describing PPO that expired after 6 months); *Morris v. Ryan*, 2011 WL 1775867, at *1 (Mich. Ct. App. May 10, 2011) (same).

Contempt Mot., ECF No. 92-4, PageID.3186; 3/12/2019 Contempt Mot., ECF No. 92-5, PageID.3207; 3/11/2019 Contempt Mot., ECF No. 92-6, PageID.3227.)  These repeated filings strongly suggest that Troy will again seek a PPO against Lindke if he follows through on his stated desire to post statements concerning her conduct. Finally, Troy's successful record of persuading Judge Lane to issue PPOs against Lindke and to hold Lindke in contempt further indicate that there is a reasonable likelihood that Lindke will again be subject to a PPO that restricts his ability to make public statements about Troy and other members of A.M.'s family.

Defendants King and Kays counter that the Court of Appeals decision in *TT v KL, supra*, eliminates any real possibility that Lindke will again be subject to a PPO that restricts his speech in violation of the First Amendment.  Defendants stress that *TT* imposed strict limits on the authority of circuit courts to issue PPOs, and they suggest that any future PPO issued against Lindke in compliance with *TT* will thus not infringe Lindke's First Amendment rights.  However, Lindke's claims here exceed the issues addressed by the Court of Appeals in *TT*.  For instance, Lindke alleges that the First Amendment and Due Process Clause forbid state courts from enjoining defamatory speech on an *ex parte* basis, but the decision in *TT* does not prohibit Michigan circuit courts from issuing such *ex parte* orders.  Thus, the decision in *TT* does not moot the bulk of Lindke's claims.  Moreover, Lindke contends that even though *TT* imposed limits on the issuance of PPO's that enjoin

speech, the decision nonetheless construed the PPO Statute in an unconstitutional manner. (*See* Tr. 2/9/2023 at 12-13, PageID.3825-26.)  For this additional reason, the Court concludes that *TT* does not moot this action.

In sum, there is a reasonable likelihood that a PPO restricting Lindke's right to speak publicly about A.M.'s family will again issue and that Lindke will not be able to obtain full and meaningful federal review of such a PPO before it expires. Thus, Lindke's claims satisfy the capable of repetition yet evading review exception to the mootness doctrine, and this Court may hear them.

### B

Defendants Kays and King next contend that the Court lacks subject-matter jurisdiction over the claims against them under the *Rooker-Feldman* doctrine.  The Sixth Circuit recently emphasized the very narrow scope of that doctrine:

> Congress has granted the federal courts jurisdiction to resolve federal questions [under] 28 U.S.C. § 1331.
>
> Does an exception to this grant of jurisdiction apply? Only the Supreme Court, not an inferior federal court, has jurisdiction to resolve appeals from "[f]inal judgments or decrees rendered by the highest court[s] of a State." *Id.* § 1257(a). *Rooker* holds that this grant of jurisdiction is exclusive, that "no court of the United States other than [the Supreme] [C]ourt" may "entertain a proceeding to reverse or modify" a state court's final judgment. 263 U.S. at 416. *Feldman* follows suit. 460 U.S. at 482 & n.16.
>
> But this § 1257(a) exception applies only in "limited circumstances." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005). Writing for a unanimous Court in *Exxon*, Justice Ginsburg explained that § 1257(a) just deals with "cases brought by state-court

30

losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284. That is an "exceedingly narrow" limitation on the jurisdiction of district courts, rarely relevant beyond the unusual fact patterns involving Rooker and Feldman. *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 400 (6th Cir. 2020); *see Van Hoven v. Buckles & Buckles, P.L.C.*, 947 F.3d 889, 892 (6th Cir. 2020); *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (emphasizing *Rooker-Feldman*'s "limited grasp" (quoting *In re Smith*, 349 F. App'x 12, 18 (6th Cir. 2009) (Sutton, J., concurring in part and dissenting in part))); *Reed v. Goertz*, 143 S. Ct. 955, 960–61 (2023) (similar).

There are many, many types of lawsuits that this discrete jurisdictional limit under § 1257(a) does not cover. It is not claim preclusion. It is not issue preclusion. It is not, in short, "preclusion by another name." *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (per curiam). It does not amount to a backstop for 28 U.S.C. § 1738, which entitles state-court judgments to "the same full faith and credit" in federal court that they receive at home. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see Lance*, 546 U.S. at 466. And it is not an all-purpose abstention doctrine, lying in wait to untangle snarls when state and federal litigation mix. *Cf.* 28 U.S.C. § 2283; *Younger v. Harris*, 401 U.S. 37, 53–54 (1971); *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813 (1976).

Unlike these distinct doctrines, moreover, the *Rooker* and *Feldman* interpretations of § 1257(a) go to our *jurisdiction*, meaning that courts must always and everywhere confront them. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514–15 (2006); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). As the Supreme Court has reminded us nearly once a year for almost two decades, we should not lightly use jurisdictional rules to pinch-hit for non-jurisdictional ones. *Arbaugh*, 546 U.S. at 514–15; *see, e.g., Boechler, P.C. v. Comm'r*, 142 S. Ct. 1493, 1497 (2022); *United States v. Kwai Fun Wong*, 575 U.S. 402, 409–10 (2015).

Even these stop signs, by the way, may not fully capture the point. Commentators have not been kind to the lower courts' extravagant use of *Rooker* and *Feldman* as a "quasi-magical means of docket-

31

clearing." Stephen I. Vladeck, *The Increasingly "Unflagging Obligation": Federal Jurisdiction After* Saudi Basic *and Anna Nicole*, 42 Tulsa L. Rev. 553, 563 (2007); *see, e.g.*, Richard H. Fallon Jr. et al., Hart & Wechsler's The Federal Courts and The Federal System 1410–11 & n.1 (7th ed. 2015) (listing examples); Samuel Bray, *Rooker Feldman (1923–2006)*, 9 Green Bag 2d 317 (2006) (reporting the death of "Rooker Feldman, the legal personality," and expressing the "hope[ ] that he leaves no survivors"). The Supreme Court, again and again, has seen fit to prune it back. *See, e.g.*, *Skinner*, 562 U.S. at 532; *Reed*, 143 S. Ct. at 960–61. One Justice indeed thought that *Exxon* had brought these jurisdictional disputes to an end, noting that it "finally interred the so-called '*Rooker-Feldman* doctrine.' " *Lance*, 546 U.S. at 468 (Stevens, J., dissenting).

All told, § 1257(a)'s negative implication requires two unusual things. It requires a challenged "judgment" in the new action. *Exxon*, 544 U.S. at 284. And it requires an effort to "review" that judgment, namely to "undo" or "overturn" it in the new action. *Id.* at 287 & n.2, 293.

*Hohenberg v. Shelby County*, __ F.4th __, No. 22-5783, 2023 WL 3559656, at *2–4 (6th Cir. May 19, 2023).

! Kays and King argue that *Rooker-Feldman* poses a complete bar to Lindke's claims against them because the claims are "really a challenge to the ruling by Judge Lane." (Mot., ECF No. 96, PageID.3385.)   The Court disagrees.   The bulk of Lindke's claims and requests for relief against Kays and King do not implicate Judge Lane's ruling.   The primary substantive contention underlying his claims is that the PPO Statute, as construed by the Michigan Court of Appeals, violates the First and Fourteenth Amendments (*see, e.g.*, Third Am. Compl. ¶ 34, 66, 88, ECF No. 92, PageID.3155, 3163, 3167), not that Judge Lane made a legal error.   And his primary request for relief is protection from the PPO Statute – through a declaratory judgment

and injunction – on a going-forward basis. (*See id.*, PageID.3174-75.)  Since these components of Lindke's claims attack the authoritative construction of the PPO Statute by the Michigan Court of Appeals and seek relief from future application of that statute, they are not barred by *Rooker-Feldman*. *See Skinner v. Switzer*, 562 U.S. 521, 532-33 (2011).

Moreover, while other components of Lindke's claims against Kays and King would, if successful, cast doubt on the correctness of some aspects of Judge Lane's rulings, that does not mean that those components of Lindke's claims are barred by *Rooker-Feldman*.  As the Sixth Circuit explained just last week, "the test" under *Rooker-Feldman* is "not" whether a plaintiff's claims "call" a state court ruling "into question." *Hohenberg*, 2023 WL 3559656, at *4.  Instead, the doctrine bars only true appeals from state court judgments. *See id.*  And Lindke's claims against Kays and King are not such an appeal. *See id*. (explaining that a claim against a non-party to an underlying state court judgment is not an appeal of that judgment).

For all of these reasons, the *Rooker-Feldman* doctrine does not deprive the Court of subject-matter jurisdiction over Lindke's claims against Kays and King.

## V

Next, while the Court declines to dismiss Lindke's claims for lack of subject-matter jurisdiction, the Court will dismiss the Post-Hearing PPO Claim (Count II of

the Third Amended Complaint) because it fails on the merits.[3]  As described above, in that claim, Lindke argues that the PPO Statute, as authoritatively construed by the Michigan Court of Appeals, wrongly "permits" circuit courts, after holding a hearing, to leave intact a previously-issued *ex parte* PPO that enjoins defamatory speech "about" the PPO petitioner. (*See* Third Am. Compl., ECF No. 92, PageID.3162.)  Lindke says that such PPOs amount to "an illegal form of prior restraint." (*Id.*)

Lindke's own concessions in this action are fatal to this claim.  Lindke has admitted that a court may enjoin defamatory speech so long as the court (1) has made a final determination that the specific speech to be enjoined is false and (2) limits the scope of the injunction to the speech found to be false. (Resp., ECF No. 102, PageID.3599-3600.)  Indeed, Lindke insists that the Sixth Circuit has adopted this rule in a published decision. (*See* Resp, ECF No. 102, PageID.3600, n. 9, citing

---

[3] Defendants Kays and King did not originally move to dismiss the entire Post Hearing PPO Claim on the merits.  However, the mootness arguments that they leveled against the claim overlapped to a large degree with the issue of whether the claim has merit, and thus the Court explored the merits of the claim in some detail during the hearing on Kays' and King's motion to dismiss.  The Court then gave the parties an opportunity to file a supplemental brief addressing the merits issues. Under these circumstances, the Court chooses to exercise its discretion to review the merits of the Post-Hearing PPO Claim. *See* 27A *Fed. Proc., L. Ed*. § 62:456 ("As a general rule, even if a party does not make a formal motion to dismiss for failure to state a claim, the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim, as long as the procedure employed is fair to the parties.")

*Lothschuetz v. Carpenter*, 898 F.2d 1200, 1208-09 (6th Cir. 1990) (Wellford, J., concurring in part and dissenting in part), and arguing that that Opinion is the Opinion of the Court in relevant part.)   And, as described in detail above, the Michigan Court of Appeals has held that a circuit court may enjoin allegedly-defamatory speech that amounts to cyberstalking by proxy if, and only if, this rule is satisfied. *See TT*, 965 N.W.2d at 120-21.  Because the Michigan Court of Appeals has limited the authority of circuit courts, following a contested hearing, to enjoin defamatory cyberstalking by proxy in the precise manner urged by Lindke in the Post-Hearing PPO Claim, the claim fails on the merits.[4]

Lindke counters that the Michigan Court of Appeals actually permits circuit courts to enjoin cyberstalking by proxy "regardless" of whether the speech at issue is "defamatory or not." (Supp. Br., ECF No. 120, PageID.3792.)   But as the Michigan Attorney General carefully explained in her post-hearing brief (*see* Supp.

---

[4] The Court declines to dismiss the Ex Parte PPO First Amendment Claim and the Ex Parte PPO Due Process Claim at this point.  It is not yet clear to the Court whether the issuance of an *ex parte* PPO against allegedly-defamatory cyberstalking by proxy complies with the First Amendment and Due Process Clause.  While *TM* and *TT* require a state circuit court to make a finding of falsity before issuing an *ex parte* PPO that enjoins allegedly-defamatory cyberstalking by proxy, it is not obvious that such a finding – made in the absence of cross-examination and adversarial testing of the petitioner's version of events – is enough to bring the PPO into compliance with the First Amendment and/or Due Process Clause.  Indeed, the key merits dispute in this action going forward seems to be whether the First Amendment and Due Process Clause permit a state court to enjoin allegedly-defamatory cyberstalking by proxy on the basis of proceedings conducted, and findings made, *ex parte*.

Br., ECF 124, PageID.3917-20), and as set forth above, that is plainly wrong.  Once again, *TT* clearly held that before a circuit court may enjoin allegedly-defamatory cyberstalking by proxy, it (the circuit court) must find that the speech at issue is, in fact, defamatory.[5]

In the alternative, Lindke argues that even if the Michigan Court of Appeals does require circuit courts to make a finding of falsity before enjoining allegedly-defamatory cyberstalking by proxy, the Court of Appeals' construction of the PPO Statute still violates the First Amendment.  In direct contradiction to his earlier concessions (described above), Lindke contends in this new argument that a PPO enjoining defamatory cyberstalking by proxy amounts to an unconstitutional prior restraint even if the court issuing the PPO first finds the speech at issue to be false and then limits the injunction to that specific speech. (*See* Supp. Br., ECF No. 120, PageID.3794-96.)  However, "[s]ix federal circuit courts of appeal have held that injunctions are permissible to prevent libel, but only after a finding on the merits that the speech is unprotected." *Williams v. Rigg*, 458 F. Supp. 3d 468, 477-78 (S.D.W. Va. 2020) (collecting cases).  "In addition, many state courts have reached the same conclusion." *Id.* (collecting cases).  Simply put, the "majority rule" is that a court

---

[5] Even if speech amounting to cyberstalking by proxy is not defamatory, it may be enjoined if the "speech integral to criminal conduct" exception to the First Amendment is satisfied. *See Buchanan*, 922 N.W.2d at 897-99.  That exception is not at issue in this action.

may enjoin defamatory speech under the limited circumstances allowed by the Michigan Court of Appeals. *Id.*

Finally, in yet another alternative argument, Lindke contends that even if the Michigan Court of Appeals has properly limited the PPO Statute, the Post-Hearing PPO Claim is nonetheless viable because certain Michigan circuit judges are not following the Court of Appeals' decisions.  Instead, those circuit judges allegedly continue to enjoin defamatory speech under the PPO Statute without first determining that the speech is untrue. (Tr., 2/9/2023, ECF No. 122, PageID.3828). However, even if a handful of circuit judges are not following the Court of Appeals' published decisions, that would not and could not strip those decisions of binding force under Michigan law. *See Catalina Mktg. Sales Corp. v. Dep't of Treasury*, 678 N.W.2d 619, 625 (Mich. 2004) (explaining that published Court of Appeals decisions are "binding precedent not only on the lower courts, but on subsequent panels of the Court of Appeals.")

For all of these reasons, the Court will dismiss the Post-Hearing PPO Claim.

## VI

The Court next turns to Kays' argument that he is entitled to qualified immunity from Lindke's claim for nominal damages.  The Court agrees with Kays and will therefore dismiss the claim for nominal damages against him.

37

## A

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Once a defendant raises a qualified immunity defense, the "plaintiff bears the burden of showing that [the] defendant is not entitled to qualified immunity." *Id.* "A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established." *Brown*, 814 F.3d at 457. "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.*

In the qualified immunity context, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the

Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013).  Courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  Simply put, defining clearly established law "requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 577 U.S. at 13).  Thus, as the Sixth Circuit has explained, a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite [such] that any reasonable official in the defendant's shoes would have understood that he was violating it.  In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff*, 134 S.Ct. at 2023).

**B**

Lindke offers two arguments as to why Kays is not entitled to qualified immunity.  Neither persuades the Court to deny such immunity to Kays.

Lindke first argues that the defense of qualified immunity is not available to a defendant who faces only a claim for nominal damages. (Resp., ECF No. 102, PageID.3594-97.)  But he cites no decision in which any court has so held.  And

"several" circuit courts of appeals have found claims for nominal damages to be barred by qualified immunity. *Hopkins v. Saunders,* 199 F.3d 968, 976–978 (8th Cir.1999); *see also Bamdad v. Drug Enf't Admin.*, 617 F. App'x 7, 9 (D.C. Cir. 2015). Moreover, there is "good reason" to apply the defense of qualified immunity to a claim for nominal damages. *Bamdad*, 617 Fed. Appx. at 9. That is because such immunity protects a defendant "*from suit"* -- and is not "a mere defense to liability," *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (emphasis added) -- and a claim for nominal damages plainly requires a defendant to defend against a "suit."

Lindke next argues that Kays is not entitled to qualified immunity because it was clearly established that his conduct violated Lindke's First and Fourteenth Amendment rights. The Court disagrees. Lindke has not cited any decision in which any court has held that a law enforcement officer violates a citizen's constitutional rights by entering an allegedly-unlawful court order into the LEIN system. And there is at least some reason to question whether an officer subjects himself to liability by doing so. In a related case involving Lindke, the Sixth Circuit affirmed the dismissal of a First Amendment claim against a sheriff who supposedly entered an unlawful PPO into the LEIN system. *See Lindke v. Tomlinson*, 31 F.4th 487, 496-98 (6th Cir. 2022). The Sixth Circuit stressed that "[t]he Michigan LEIN system is used to collect, protect, and disseminate information" and that "entering any information in that system is a far cry" from other conduct that has given rise to

40

liability against employees of a sheriff's office for constitutional injuries. *Id*.  Under these circumstances, Lindke has failed to show that every reasonable officer in Kays' position would have understood that the First and Fourteenth Amendments prohibited him from entering the Ex Parte PPO into the LEIN system.  Accordingly, Kays is entitled to qualified immunity. *See O'Malley v. City of Flint*, 652 F.3d 662, 672 (6th Cir. 2011) (holding that officer was entitled to qualified immunity where plaintiff failed to show that any reasonable officer in defendant's position would have understood that his conduct was unconstitutional). !

## VII

!      The Court now turns to Troy's motion to dismiss.  In that motion, she argues that Lindke's Section 1983 claims against her fail as a matter of law because she is not a state actor.  The Court agrees.

!      "A § 1983 claim must satisfy two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Ellison v. Garbarino,* 48 F.3d 192, 194 (6th Cir.1995) (internal quotation marks and citation omitted).  Thus, "[a] plaintiff [generally] may not proceed under § 1983 against a private party no matter how discriminatory or wrongful the party's conduct." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (internal quotation marks and citation omitted).  "Nevertheless, there are circumstances under which private persons may, by their actions, become

41

'state actors' for § 1983 purposes." *Id.*   The Sixth Circuit identified those

circumstances in *Tahfs, supra*: ‼

> "Private persons, jointly engaged with state officials in [a] prohibited action, are acting under color of law for purposes of the statute. To act under color of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (internal quotation marks and citation omitted). Therefore, a private party can fairly be said to be a state actor if (1) the deprivation complained of was "caused by the exercise of some right or privilege created by the State" and (2) the offending party "acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Generally, "a private party's mere use of the State's dispute resolution machinery, without the 'overt, significant assistance of state officials,' cannot [be considered state action]." *Am. Mfrs., 119 S.Ct. 977,* 526 U.S. at 54 (quoting *Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478, 486, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988)). Finally:

>> This circuit recognizes three tests for determining whether private conduct is fairly attributable to the state: the public function test, the state compulsion test, and the nexus test. The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state.... The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state. Finally, the nexus test requires a sufficiently close relationship (i.e., through state regulation or contract) between the state and the private actor so that the action taken may be attributed to the state.

>> *Ellison,* 48 F.3d at 195 (internal quotation marks and internal citations omitted).

*Tahfs,* 316 F.3d at 590–91.

In *Tahfs*, the Sixth Circuit held that a private individual who sought a PPO under the PPO Statute – just as Troy did here – was not a state actor and could not be sued under Section 1983.  The court offered the following analysis:

> Applying the three-part state action test laid down by the court in *Ellison,* it is clear that by obtaining a PPO from a state court, a private litigant does not make himself or herself a state actor. First, Tahfs does not meet the "public function test," which "requires that the private entity exercise powers which are traditionally exclusively reserved to the state." *Ellison,* 48 F.3d at 195. When applying this test, the court generally conducts an historical analysis to determine whether the private party has engaged in actions traditionally reserved to the state. *Ellison,* 48 F.3d at 196. Here, Tahfs failed to provide any historical argument or analysis. "Considering that plaintiff bears the burden on this issue, this failure alone renders this test inapplicable." *Id.* Furthermore, it cannot be said that by obtaining a PPO the petitioner is taking over a state role. "More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives." *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992). In fact, the state, through its courts and police powers, retains the authority and responsibility to enforce the PPO.
>
> Under the "state compulsion test," it is clear that Michigan did not encourage or coerce the Proctors to file for a PPO; the state merely made it possible to obtain a PPO. In *Ellison,* the state provided a procedure allowing private physicians to commit mentally ill patients to the hospital, and it was held that the commitment action "completely leaves [the decision] to the private individual's discretion." *Ellison,* 48 F.3d at 196. As in *Ellison,* here the decision to seek a PPO is entirely the private decision of the petitioner.
>
> Finally, under the "nexus test," Tahfs argues that based on her allegations of joint action, and construing the complaint liberally in her favor, she has pled a "sufficiently close relationship." *Id.* at 195. Yet, as discussed, Tahfs does nothing more than make conclusory allegations about corrupt joint action in the Wayne County Circuit Court without describing any corrupt action or identifying any corrupt actor. Tahfs's generalized and conclusory accusations do not meet even

the low threshold necessary to survive a motion to dismiss. Tahfs's complaint does not satisfy the nexus test.

*Id.* at 593-94. *Tahfs* is fatal to Lindke's claims against Troy under Section 1983.

Lindke counters that the Sixth Circuit in *Tahfs* addressed only a "corrupt complicity" theory of state action. (Resp., ECF No. 114, PageID.3768-69.) But that narrow reading of *Tahfs* cannot be squared with the Sixth Circuit's plain language. The court did not limit its analysis to the "corrupt complicity" theory. Instead, as the quoted excerpt above makes clear, the court applied all three parts of the state action test and specifically concluded that a PPO petitioner is not a state actor under the tests relied upon by Lindke. *See also Chaplin v Anderson*, 2020 WL 2192553 (6th Cir. Feb. 20 2020) (affirming dismissal of Section 1983 claim against private citizen based upon act of seeking a PPO )[6]; *Rosen v. County of Suffolk*, 53 Fed. Appx. 578, 580 (2d Cir. 2002) (holding that private party who sought a protection order from a state court was not a state actor and could not be sued under Section 1983); *Hatfield v. Marion County Govt.*, 2010 WL 5256811, at *3 (E.D. Tenn. Dec. 17, 2010) (holding that under *Tahfs*, a private citizen who sought an order of protection from a state court was not a state actor subject to suit under Section 1983); *Clack v.*

---

[6] The Sixth Circuit's decision in *Chaplin* affirmed a decision of this Court adopting a Report and Recommendation. That Report and Recommendation cited *Tahfs* for the proposition that a private citizen's "act of obtaining a P.P.O. against Plaintiff does not make her a state actor, for purposes of Section 1983." *Chaplin v. Anderson*, 2019 WL 2251832 at *3 (E.D. Mich. 2019) (Report and Recommendation).

*Kentucky*, 2018 WL 3747470, at * 5 (W.D. Ky. Aug. 7, 2018) (same); *Mikhail v. Kahn*, 991 F.Supp.2d 596, 654-56 (E.D. Pa. 2014) (holding that private party who sought a protection order from a state court was not a state actor and could not be sued under Section 1983).

Because Lindke has failed to plausibly allege any theory of state action by Troy, his claims against her under Section 1983 fail as a matter of law.

## VIII

To summarize, for all of the reasons explained above:

1.  Troy's motion to dismiss is **GRANTED**, and all of the claims against her are **DISMISSED WITH PREJUDICE**;

2.  Count II of the Third Amended Complaint is **DISMISSED WITH PREJUDICE** in its entirety;

3.  Lindke's claim for nominal damages against Kays is **DISMISSED WITH PREJUDICE**;

4.  The sole remaining claims in this action are Lindke's claims in Counts I and III of the Third Amended Complaint, in which he seeks (a) a declaration that the PPO Statute, as authoritatively construed by the Michigan Court of Appeals, violates the First and Fourteenth Amendments to the extent that it permits a circuit court to enjoin allegedly-defamatory cyberstalking by proxy without first determining,

after a full adversarial hearing, that the speech to be enjoined is false and, thus, unprotected under the First Amendment; and (b) an injunction precluding enforcement against him of the PPO Statute, as authoritatively construed by the Michigan Court of Appeals, to the extent that the statute permits a circuit court to enjoin allegedly-defamatory cyberstalking by proxy without first determining, after a full adversarial hearing, that the speech to be enjoined is false and, thus, unprotected under the First Amendment.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 24, 2023


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 24, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126